PELLETIER, Appellee,

v.

RUMPKE CONTAINER SERVICE, Appellant.

[Cite as *Pelletier v. Rumpke Container Serv.* (2001), 142 Ohio App.3d 54.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000258.

Decided March 30, 2001.

**56**

*Freking & Betz, Randolph H. Freking* and *Kelly Mulloy Myers,* for appellee.

*Keating, Muething & Klekamp, P.L.L., Louis F. Gilligan* and *Paul D. Dorger,* for appellant.

*Per Curiam.*

Defendant-appellant Rumpke Container Service appeals the trial court's denial of its motions for a directed verdict, judgment notwithstanding the verdict, and a new trial following the judgment entered in favor of its former employee, plaintiff-appellee Michael D. Pelletier, on his claims for age discrimination and wrongful discharge in violation of public policy.

## FACTS AND PROCEEDINGS

In August 1998, Pelletier filed suit against Rumpke, alleging claims for state age and disability discrimination and wrongful discharge in violation of public policy. Rumpke was subsequently granted summary judgment on Pelletier's disability-discrimination claim and on the aspects of Pelletier's wrongful-discharge claim that were predicated on disability discrimination and retaliation for filing a worker's compensation claim. Pelletier's remaining claims for age discrimination and wrongful discharge relating to the alleged age discrimination were heard by a jury in January 2000.

The evidence presented at trial demonstrated that Pelletier was a longstanding employee of Rumpke, having worked for the company in one capacity or another for approximately twenty years. In 1996, he was working as a truck driver at Rumpke's Georgetown, Ohio facility and was forty-six years old. According to all

accounts, he was a skilled driver and a good employee with no history of attendance problems.

On Wednesday, August 14, 1996, however, Pelletier was discharged by Rumpke after he had failed to timely report to work on that day and on the prior two days. Rumpke claimed that Pelletier's discharge was mandated by a provision of its attendance policy referred to as "no call/no show," which provided that "employees who [were] absent for three consecutive working days without notifying their supervisor or manager [were to] be released as voluntary quits." Rumpke's attendance policy also included the following relevant provisions: (1) that managers had "the final decision" as to whether an absence was considered excused or unexcused and (2) that, in dealing with attendance issues, "a manager [was to] consider all the facts and circumstances of a particular case, including the employee's overall work, and prospects for future improvement and maintenance of an acceptable record."

Pelletier did not dispute that he had failed to report to work on the days in question. He claimed, however, that he had believed he was scheduled to be on vacation that week, that no one from Rumpke had called him regarding his unexplained absences, and that he had only discovered that Rumpke had considered him absent when he happened to call the office on Wednesday, August 14, to inquire as to whether his vacation paycheck was available.

It is undisputed that the scheduling of vacation time was handled fairly informally at the Georgetown facility. Vacation requests were made verbally to dispatch supervisor James Gatts and were granted by him according to seniority. Gatts initially recorded the dates in a small pocket calendar, but once each employee had chosen vacation time, he transferred the vacation schedule to a large calendar that was displayed on a wall in the dispatch office.

Although Gatts agreed that Pelletier was to be on vacation in August, he asserted that Pelletier's vacation had not been scheduled until the week of August 19. Gatts recalled that he and Pelletier had discussed and scheduled this vacation in May 1996. According to him, Pelletier had initially requested to take vacation the week of August 12. But, because another, more senior employee had already scheduled a vacation that week, Pelletier opted to schedule his vacation for the week of August 19. In addition, Gatts claimed that he had spoken with Pelletier on August 10, 1996, and had verified that he would be on vacation the week of August 19. Furthermore, Gatts's pocket and wall calendars indicated that Pelletier was to be on vacation the week of August 19.

Moreover, Gatts questioned the legitimacy of Pelletier's August 14 telephone call regarding his vacation paycheck. According to Gatts, vacation paychecks were always available on the Thursday preceding an employee's vacation. Therefore, Gatts maintained, the fact that Pelletier's check had not been available prior

to August 12 should have prompted concern in Pelletier if he truly believed his vacation was scheduled for August 12.

Pelletier maintained that Gatts had things backwards, that he had initially requested the week of August 19 for vacation, but had been granted vacation for the week of August 12. And, with regard to the vacation paycheck, Pelletier explained that, several years previously, his vacation paycheck had been available only on the Wednesday of the week of his vacation. Therefore, it had not concerned him when his check had not been available on the Thursday prior to vacation in this instance.

Furthermore, Pelletier contended, even if he had been mistaken as to the date of his vacation and was technically in violation of the "no call/no show" policy, other provisions of Rumpke's attendance policy gave a manager discretion to excuse an absence and required the manager to consider the facts and circumstances of the case (including the employee's overall work history) in dealing with an attendance problem.

Pelletier maintained that the circumstances of his case, specifically the inadvertent nature of his absences and his exemplary work history, demanded a mitigation of discipline. He claimed that Rumpke's refusal to consider these circumstances was contrary to company policy and practice, as well as demonstrative of Rumpke's desire to fire him unlawfully. In support of this assertion, Pelletier presented evidence of a number of instances in which Rumpke, after considering the overall circumstances, had opted to impose lesser discipline on younger employees who had violated aspects of the attendance policy.

Rumpke maintained, however, that the instances cited by Pelletier did not involve violations of the "no call/no show" policy but, rather, involved violations of other provisions of the attendance policy, such as being tardy or absent on multiple, nonconsecutive occasions. According to Rumpke, the "no call/no show" policy was a unique aspect of its attendance policy that, unlike other provisions, was uniformly implemented without consideration of mitigating circumstances. Accordingly, although the company had sometimes subjected employees who had violated other provisions of the attendance policy to lesser discipline than that outlined in the attendance policy, it had in no instance not terminated an employee who had violated the "no call/no show" policy.

As further evidence of discrimination, Pelletier pointed to Rumpke's failure to telephone him following his unscheduled absences. Pelletier suggested that this was a deliberate attempt by Rumpke to lull him into violating the "no call/no show" policy so that it could fire him under that pretext. Pelletier pointed to Gatts's handwritten notes of the incident, which reflected that Melissa Prybal, district manager of the Georgetown facility, had suggested on August 12 that Gatts telephone Pelletier to inquire about his absence. The notes further

reflected that, after speaking with Larry Stone, the general manager of Rumpke, Prybal had instructed Gatts *not* to telephone Pelletier. Prybal later included Gatts's notes in a typewritten summary of the incident that she provided to the human-resources department. In doing so, she copied the notes verbatim, with the exception of Gatts's references to her comments regarding whether Pelletier should be contacted, which she excluded.

Both Gatts and Stone asserted that it was company policy not to call employees at home regarding attendance problems. Further, Prybal maintained that she had deleted the references to telephoning Pelletier because she had not wanted others in the company to know that she had been unaware of the policy of not calling employees at home.

Finally, Pelletier maintained that Rumpke's discriminatory intent was further demonstrated by the fact that it had replaced him with Jim Light, who was only thirty-six years old. Rumpke argued, however, that Light had not "replaced" Pelletier. It claimed that Pelletier's work had been reassigned among various employees, including Light.

At the close of the evidence, Rumpke made a motion for a directed verdict on the claims, which was denied by the trial court. Rumpke also unsuccessfully objected to the issue of punitive damages being submitted to the jury. After completing its deliberations, the jury returned a verdict of $150,000 in compensatory damages and $350,000 in punitive damages in favor of Pelletier on his age-discrimination claim. Thereafter, the trial court journalized an entry reflecting the jury's verdict, as well as a judgment in favor of Pelletier on the wrongful-discharge claim, and an award of $64,211 in attorney fees and $5,259.64 in costs.

Following the trial court's denial of its post-trial motions for judgment notwithstanding the verdict and for a new trial, Rumpke filed the instant appeal. In its four assignments of error, Rumpke asserts that the trial court erred in (1) denying its motions for a directed verdict and judgment notwithstanding the verdict on Pelletier's age-discrimination claim, (2) denying its motion for judgment notwithstanding the verdict on the issues of punitive damages and attorney fees, (3) denying its motion for a new trial based on the weight of the evidence with respect to the age-discrimination claim, and (4) entering judgment in favor of Pelletier on his claim for wrongful discharge.

## ASSIGNMENTS OF ERROR

In its first assignment of error, Rumpke asserts that the trial court erred as a matter of law in denying its motions for a directed verdict and judgment notwithstanding the verdict on Pelletier's age-discrimination claim, where Pelleti-

er offered no evidence that his age was a motivating factor in Rumpke's decision to discharge him. We disagree.

The standard of review for a ruling on a motion for a directed verdict or a motion for judgment notwithstanding the verdict is the same. For each, the court must construe the evidence most strongly in favor of the nonmoving party, and where there is substantial evidence to support that side of the case, upon which reasonable minds could reach different conclusions, the motion must be overruled. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either motion.[1]

In its primary argument in support of this assignment, Rumpke contends that Pelletier failed to establish a prima facie case of age discrimination. In *Yelton v. Stehlin*,[2] this court recently concluded that "where [a] trial judge has determined that a prima facie case has been made and after a trial on the merits in favor of the plaintiff, the issue of whether the plaintiff succeeded in establishing a prima facie case is not reviewable on appeal." Moreover, we concluded that "the relevant inquiry on appeal should be whether the plaintiff produced sufficient evidence to sustain the jury's findings that the plaintiff was the victim of discrimination."[3] In so concluding, we relied on federal case law.[4] We believe this approach is consistent with the rule, as stated by the Ohio Supreme Court in *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*,[5] that federal case law interpreting Title VII is generally applicable to cases involving claims of discrimination under R.C. Chapter 4112.[6]

Because the trial court determined that a prima facie case had been established when it denied Rumpke's original motions for summary judgment and a directed verdict, and the jury thereafter returned a verdict on the merits in favor of

---

1. See Civ.R. 50; *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145, citing *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 429–430, 344 N.E.2d 334, 338.

2. (Aug. 20, 1999), Hamilton App. No. C–980503, unreported, 1999 WL 631002.

3. See, also, *Toole v. Cook* (May 6, 1999), Franklin App. No. 98AP–486, unreported, 1999 WL 280804.

4. See *United States Postal Serv. Bd. v. Aikens* (1983), 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403; *Equal Emp. Opportunity Comm. v. Avery Dennison Corp.* (C.A.6, 1997), 104 F.3d 858, 861.

5. (1981), 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131.

6. See *Byrnes v. LCI Communication Holdings Co.* (1996), 77 Ohio St.3d 125, 132–33, 672 N.E.2d 145, 150–151 (Resnick, J., dissenting), But, see, *Byrnes, supra* (plurality opinion); *Olive v. Columbia/HCA Healthcare Corp.* (Mar. 9, 2000), Cuyahoga App. Nos. 75249 and 76349, unreported, 2000 WL 263261.

Pelletier, we will not review Rumpke's contention that Pelletier failed to make out a prima facie case. Instead, we proceed directly to the ultimate question of whether Pelletier produced sufficient evidence to sustain the jury's determination that he was discharged because of his age.[7] In doing so, we note that, although "the [trier of fact's] rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff," the trier of fact may "infer the ultimate fact of discrimination from the falsity of the employer's explanation."[8]

◼ Here, there was substantial evidence upon which the jury could reasonably have concluded that Rumpke's proffered reason for terminating Pelletier was a pretext, and that he was actually terminated because of his age. Specifically, the jury could have believed that Pelletier was mistaken about the date of his vacation and that Gatts had suspected his mistake, but nonetheless refused to contact him regarding his absence. Moreover, the jury could have disbelieved Gatts's and Stone's purported explanation for refusing to contact Pelletier. The jury could, instead, have believed that Gatts and Stone opted not to contact Pelletier because they were setting him up to be fired. Moreover, the jury could have believed that Prybal's deletion of the portion of Gatts's notes that referred to whether Pelletier should be contacted evidenced an attempt to cover up Rumpke's desire to fire Pelletier. These beliefs, combined with the undisputed evidence of Pelletier's favorable employment history and the jury's belief (as demonstrated by its interrogatory) that Pelletier was replaced by a younger employee or was treated differently than similarly-situated younger employees who violated the attendance policy, provided a reasonable basis upon which the jury could have inferred that Rumpke had actually fired Pelletier because of his age. Accordingly, we overrule the first assignment of error.

◼ In its second assignment of error, Rumpke contends that the trial court erred in denying its motion for judgment notwithstanding the verdict on the award of punitive damages, where Pelletier presented no evidence of malice. We agree.

◼ A showing of "actual malice" is necessary to support an award of punitive damages. Therefore, proof of discrimination in violation of R.C. Chapter 4112 does not automatically entitle a plaintiff to an award of punitive damages.[9]

---

7.  See *Aikens, supra; Avery Dennison Corp., supra.*

8.  See *Reeves v. Sanderson Plumbing Prod., Inc.* (2000), 530 U.S. 133, 146–147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105, 119–120.

9.  See *Rice v. CertainTeed Corp.* (1999), 84 Ohio St.3d 417, 704 N.E.2d 1217, stating that, although punitive damages are recoverable under R.C. 4112.99, a plaintiff is not automatically entitled to punitive damages upon proof of a violation of R.C. Chapter 4112.

"Actual malice, necessary for the award of punitive damages, is (1) the state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." [10]

Here, Pelletier made no allegation that Rumpke or any of its employees had acted with hatred, ill will, or a spirit of revenge. In fact, Pelletier indicated at trial that, given the opportunity, he would like to return to work for Rumpke. And, on appeal, we are told that he did so in January of 2000. Rather, Pelletier argues that Rumpke acted with actual malice by consciously disregarding his rights when it discharged him because of his age.

The Ohio Supreme Court has indicated that conduct sufficient to satisfy the "conscious disregard" prong of the definition of "actual malice" must be of such a nature as to be regarded as "outrageous, flagrant, and criminal." [11] Having reviewed the record, we conclude that the evidence presented by Pelletier did not show conduct that rose to the level of outrageous, flagrant, or criminal and, therefore, was not sufficient as a matter of law to allow the jury to conclude that Rumpke had acted with actual malice. Accordingly, we conclude that the trial court erred in overruling Rumpke's motion for judgment notwithstanding the verdict on the issue of punitive damages. The punitive-damages award is, therefore, reversed. And, as Rumpke correctly notes, we must also reverse the award of attorney fees, as it was dependent upon the finding of bad faith implicit in the award of punitive damages.[12] We decline, however, to reverse the trial court's award of costs, as Rumpke requests. This award was not dependent upon the award of punitive damages but was authorized by Civ.R. 54(D), which provides a trial court with discretion to award costs to the prevailing party. Accordingly, the second assignment of error is sustained in part and overruled in part.

In its third assignment of error, Rumpke asserts that the trial court erred in refusing to grant its motion for a new trial. Rumpke first argues that it was entitled to a new trial under Civ.R. 59(A)(6), because the jury's verdict was not sustained by the weight of the evidence. We disagree.

■ Unlike the review of a motion for a directed verdict or for judgment notwithstanding the verdict, a trial court reviewing a motion for a new trial under Civ.R. 59(A)(6) must weigh the evidence and the credibility of the witnesses to

---

10. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.

11. See *Preston*, 32 Ohio St.3d at 336, 512 N.E.2d at 1176.

12. See *Ward v. Hengle* (1999), 134 Ohio App.3d 347, 351, 731 N.E.2d 198, 201.

determine whether a manifest injustice has been done.[13] "Where a jury verdict is supported by substantial competent, credible evidence, it is an abuse of discretion to grant a motion for a new trial." [14]

█ In its argument in support of this assignment of error, Rumpke makes much of the fact that it presented competent, credible evidence to support its allegation that Pelletier was discharged for a reason unrelated to age. In our view, this point merely highlights the fact that there were conflicts in the evidence on nearly every aspect of this case. It does nothing to negate the substantial credible evidence supporting the conclusion reached by the jury that Rumpke had discriminated against Pelletier based on his age. Given these circumstances, the trial court properly exercised its discretion in denying the motion for a new trial under Civ.R. 59(A)(6).

Rumpke also asserts that it was entitled to a new trial under Civ.R. 59(A)(9), because the trial court had erred in the admission and exclusion of evidence.

█ Rumpke first challenges the trial court's decision to permit the jury to view only those portions of Prybal and Gatts's notes that related to August 12, 13, and 14. The record reveals that the trial court excluded portions of Gatts's and Prybal's notes on the ground that they contained information that was unrelated to the operative time period and were, therefore, extraneous. We are unable to conclude that this ruling constituted an error of law or an abuse of discretion.

Second, Rumpke contends that the trial court erred in admitting three exhibits that were not properly authenticated. This argument lacks merit, however, insofar as Rumpke's Human Resources Director, Kathy Peck, testified that the exhibits in question, which consisted of records of discipline imposed on employees who had committed attendance violations, were part of Rumpke's personnel files. This testimony was sufficient to demonstrate that the documents were what Pelletier claimed they were.[15] The trial court, therefore, properly admitted the exhibits. Accordingly, we conclude that the trial court did not err in overruling Rumpke's motion for new trial under Civ.R. 59(A)(9). The third assignment is overruled.

█ In its fourth and final assignment of error, Rumpke claims that the trial court erred in finding that the jury had rendered a verdict in favor of Pelletier on the claim for wrongful discharge in violation of public policy, where the issue was

---

13. See *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685; *Meyers v. Hot Bagels Factory, Inc.* (1999), 131 Ohio App.3d 82, 721 N.E.2d 1068.

14. *Hancock v. Norfolk & W. Ry. Co.* (1987), 39 Ohio App.3d 77, 81, 529 N.E.2d 937, 942.

15. See Evid.R. 901.

never presented to the jury. Pelletier, on the other hand, contends that, although the jury was not specifically instructed on the elements of the wrongful-discharge claim, the trial court did not err in entering judgment in his favor on the claim because it was derived from his age-discrimination claim, which the jury was instructed on and which they found in his favor.

We begin by noting the significant point seemingly ignored by Pelletier that his claim for wrongful discharge in violation of public policy, though founded on the same factual allegations as his age-discrimination claim, was a separate and independent cause of action with its own elements of proof. Consequently, in the absence of a verdict by the jury on the wrongful-discharge claim to indicate that he had succeeded in proving those elements to the jury's satisfaction, the trial court lacked the authority to enter judgment for Pelletier on the claim.[16] Nonetheless, the trial court's judgment entry constituted a final appealable order under R.C. 2505.02.

Moreover, the record demonstrates that Pelletier failed to object to the trial court's failure to instruct the jury on the claim and acceded to the submission of the case to the jury solely on the claim for age discrimination. By doing so, Pelletier effectively abandoned the wrongful-discharge claim.

We, therefore, hold that the trial court erred in journalizing a judgment entry that reflected that the jury had rendered verdict in favor of Pelletier on the claim. Accordingly, we sustain the fourth assignment of error and vacate the judgment entered on the wrongful-discharge claim.

## CONCLUSION

For the reasons stated above, we reverse that portion of the judgment awarding Pelletier punitive damages and attorney fees and enter judgment for Rumpke on those claims. We also vacate the judgment to the extent that it reflected a verdict favorable to Pelletier on the claim for wrongful discharge in violation of public policy. We affirm the balance of the judgment.

*Judgment accordingly.*

GORMAN, P.J., PAINTER and SUNDERMANN, JJ., concur.

---

16. See *Collins v. Rizkana* (1995), 73 Ohio St.3d 65, 652 N.E.2d 653 (reciting elements for the tort of wrongful discharge in violation of public policy and noting that two of the four elements involve factual issues that must be decided by a jury.)