SOUTHSIDE RIVER–RAIL TERMINAL, Inc., Appellee and Cross–Appellant;
Reclaim of Norwich, England Insurance Company, Intervening Appellee
and Cross–Appellant; Lindsey Motor Express, Inc.

v.

CRUM & FORSTER UNDERWRITERS OF OHIO, Appellant and Cross–Appellee;
Crum & Forster Insurance Company et al.; Schiff, Kriedler–Shell, Inc.

[Cite as *Southside River–Rail Terminal v. Crum & Forster Underwriters
of Ohio,* 157 Ohio App.3d 325, 2004-Ohio-2723.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–030400, C–030423 and C–030445.

Decided May 28, 2004.

Lindhorst & Dreidame, James L. O'Connell and Bradley D. McPeek, for appellee and cross-appellee Southside River–Rail Terminal, Inc.

Keating, Muething & Klekamp, P.L.L., Gregory M. Utter and David M. Gallagher, for intervening appellee and cross-appellant Reclaim of Norwich, England Insurance Company.

Ulmer & Berne, LLP, Marvin L. Karp and Frederic X. Shadley, for appellant and cross-appellee Crum & Forster Underwriters Co. of Ohio.

GORMAN, Judge.

{¶ 1} In these consolidated appeals, the parties contest whether defendant-appellant and cross-appellee Crum & Forster Underwriters of Ohio ("C & F") must provide property-damage coverage for the collapse of a storage tank owned by plaintiff-appellee and cross-appellant Southside River–Rail Terminal, Inc. and for the loss of its contents separately insured by intervening plaintiff-appellee and cross-appellant Reclaim of Norwich, England Insurance Company. The parties dispute coverage under three policies issued to Southside by C & F: the Deluxe

Property Form ("the Deluxe form"), the newly offered Custom Deluxe Property Form ("the Custom form"), and a Comprehensive General Liability policy ("the CGL"). The tank collapse released 990,000 gallons of liquid nitrogen fertilizer onto Southside's industrial site and into the Ohio River.

{¶ 2} All the parties appeal from the trial court's May 2002 entry of partial summary judgment on coverage and pollution-exclusion issues. C & F also appeals from the May 2003 judgment entered following the jury verdict on causation.[1]

{¶ 3} Because the trial court erred in holding that the pollution-exclusion clauses were ambiguous, we reverse its ruling on that issue alone. Because the trial court properly found coverage under the Custom form only, we affirm the judgment from which Southside's and Reclaim's cross-appeals derive. Because we find no error in the trial court's denial of C & F's motion for a directed verdict and in the court's instructions to the jury on the issue of causation, we otherwise affirm the May 2003 judgment.

## FACTS

### The Tank Collapse

{¶ 4} On January 8, 2000, a storage tank at the Sedamsville Lindsey Motor Express facility owned by Southside collapsed, dumping approximately 990,000 gallons of liquid Uran 28 onto the ground and into the Ohio River. Uran 28 is an aqueous solution of ammonium nitrate and urea. The cylindrical tank, filled to near its one-million-gallon capacity, was forty feet tall and 66 feet in diameter. The Uran 28 escaped with so much force that it toppled a concrete retaining wall and punctured an earthen dike. The sides of the tank spread apart, striking and damaging three nearby tanks. Two tractors were washed into the Ohio River. Cincinnati fire and police units, the Coast Guard, the EPA, and Southside's hazardous-materials clean-up contractor all responded to Southside's tank farm. Containment booms were placed in the Ohio River, and several downstream communities added additional chemicals to their water-treatment facilities to guard against potable-water contamination. The Uran 28 was owned by PCS Nitrogen Fertilizer L.P. Southside had a contract for receipt, storage, and shipping of PCS's product. Reclaim insured the Uran 28 for PCS.

---

1. As claims involving alleged bad faith by C & F and involving Southside's insurance agent, defendant Schiff, Kriedler–Shell, Inc. and defendant Fireman's Fund Insurance Co. remain unresolved, the trial court included a Civ.R. 54(B) certification that no just reason for delay prevented appellate review of the otherwise final summary-judgment and trial issues. See *Stevens v. Ackman* (2001), 91 Ohio St.3d 182, 186, 743 N.E.2d 901.

{¶ 5} Several experts investigated the collapse. All agreed that there was no evidence of explosion or operator negligence and that the primary cause of the collapse was the improper welding of the tank seam at the time of construction. The defective welds failed, causing the wall of the cylindrical tank to separate vertically, from bottom to top, spilling its contents.

{¶ 6} Southside's analysis of the collapse by John P. Sauer, a project engineer, and by Bruce P. Bardes, an engineer with a doctorate in metallurgy and a former professor at the University of Cincinnati and Miami University, concluded that the collapse was caused by the combination of the defective welds and the stress level resulting from the weight of the 990,000 gallons of Uran 28 solution within the tank.

{¶ 7} C & F's expert, Dennis L. McGarry, a project engineer with a doctorate in metallurgical engineering, concluded that "the combination of poor welds and the tank being full of fertilizer led to the failure. This is true. But only one of the conditions was abnormal. The poor welds were a design or manufacturing defect. **The tank being full of fertilizer was an expected and normal condition.** * * * The primary abnormal or defective cause of the tank failure was poor welds. The loading condition that caused the welds to fail was the pressure and corresponding stress created by the tank being used for its intended purpose, to hold fertilizer." (Emphasis in the original.)

## THE SUMMARY–JUDGMENT ASSIGNMENTS OF ERROR

### The Standard of Review

{¶ 8} The function of summary judgment is to determine from the evidentiary materials whether triable factual issues exist, regardless of whether the facts are complex. A court is not precluded from granting summary judgment merely because of the multiplicity of claims or because of the volume of the factual record. See *Gross v. Western–Southern Life Ins. Co.* (1993), 85 Ohio App.3d 662, 666–667, 621 N.E.2d 412; see, also, *Hamilton Cty. Bd. of Commrs. v. Cincinnati*, 154 Ohio App.3d 504, 2003-Ohio-5089, 797 N.E.2d 1027, at ¶ 10.

{¶ 9} Because summary judgment presents only questions of law, an appellate court reviews the record de novo. See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243. A motion for summary judgment shall be granted if the court, upon viewing the inferences to be drawn from the underlying facts set forth in the pleadings, depositions, answers to interrogatories, written admissions, and affidavits in a light most favorable to the party opposing the motion, determines (1) that no genuine issue of material fact remains to be litigated; (2) that the moving party is entitled to judgment as a matter of law; and (3) that the evidence demonstrates that reasonable minds can come to but one conclusion and

that conclusion is adverse to the party opposing the motion. See Civ.R. 56(C); see, also, *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264.

## The Canons of Construction for Insurance Contracts

{¶ 10} Under Ohio law, an insurance policy is a contract, and a court's construction of any contract is a matter of law. See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. When the intent of the parties is evident from the clear and unambiguous language in the agreement, a court must enforce the contract as written and give the words their plain and ordinary meaning. See *Hybud Equip. Corp. v. Sphere Drake Ins. Co.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096; see, also, *Cincinnati Indemn. Co. v. Martin* (1999), 85 Ohio St.3d 604, 607, 710 N.E.2d 677. But if the language in the policy is ambiguous, the contract must be construed strictly against the insurer. See *Faruque v. Provident Life & Acc. Ins. Co.* (1987), 31 Ohio St.3d 34, 38, 31 OBR 83, 508 N.E.2d 949.

{¶ 11} In the review of an insurance policy, the words and phrases within the policy "must be given their natural and commonly accepted meaning, where they in fact possess such meaning, to the end that a reasonable interpretation of the insurance contract consistent with the apparent object and plain intent of the parties may be determined." *Gomolka v. State Auto. Mut. Ins. Co.* (1982), 70 Ohio St.2d 166, 167–168, 24 O.O.3d 274, 436 N.E.2d 1347.

{¶ 12} An exclusion within an insurance policy must be interpreted as applying only to that which is clearly intended to be excluded. See *Hybud*, 64 Ohio St.3d at 665, 597 N.E.2d 1096. "Where exceptions, qualifications or exemptions are introduced into an insurance contract, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof." *Home Indemn. Co. of New York v. Plymouth* (1945), 146 Ohio St. 96, 32 O.O. 30, 64 N.E.2d 248, paragraph two of the syllabus. "[I]f a policy does not plainly exclude a claim from coverage, then an insured may infer that the claim will be covered." *Andersen v. Highland House Co.* (2001), 93 Ohio St.3d 547, 549, 757 N.E.2d 329.

## No Coverage Under the Deluxe Form

{¶ 13} In their sole assignment of error, Southside and Reclaim each claim that the trial court erred in entering summary judgment in C & F's favor on whether they had coverage for the tank collapse under the Deluxe form. The provisions of the Deluxe form unambiguously indicated that the collapse was not covered.

{¶ 14} First, the exclusions section of the Deluxe form stated the following:

{¶ 15} "2. *We will not pay for loss or damage* caused by or resulting from any of the following: * * *

{¶ 16} "k. Collapse, *except as provided below in the Additional Coverage for Collapse*. But if loss or damage by a Covered Cause of Loss results at the described premises, we will pay for that resulting loss or damage." (Emphasis added.)

{¶ 17} In other words, a loss caused by or resulting from collapse was specifically excluded from the coverage provided by the Deluxe form unless the collapse met the requirements of the additional coverage provided for collapse. That section provided the following:

{¶ 18} "1. Collapse:

{¶ 19} "We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building *caused only by one or more of the following:* * * *

{¶ 20} "(d) Weight of people or personal property; * * *

{¶ 21} "(f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs *during the course of the construction,* remodeling or renovation." (Emphasis added.)

{¶ 22} Southside and Reclaim's primary contention below was that the collapse was caused, in part, by defective welding, and in part by the weight of the Uran 28 contents within the tank. But only one of those causes—the weight of personal property—was among the causes listed in the Deluxe form's additional-coverage provision. Because the collapse did not occur during construction, the defective-methods cause was not applicable to this loss.

{¶ 23} Southside contends that other policy language in the "faulty workmanship" exclusion of Section (B)(3)(c)(2) provided a "concurrent cause" theory of recovery, that is, "where a policy expressly insures against direct loss and damage by one element but excludes loss or damage caused by another element, the coverage extends to the loss even though the excluded element is a contributory cause." *Gen. Am. Transp. Corp. v. Sun Ins. Office, Ltd.* (C.A.6, 1966), 369 F.2d 906, 908. The concurrent-cause theory was inapposite to the case at bar where the form specifically provided that C & F "will not pay for loss or damage caused by or resulting from * * * collapse, except as provided * * * in the Additional Coverage for Collapse." Tar, Deskman Baumann, Insurance Coverage for Collapse Claim: Evolving Standards and Legal Theories (1999), 35 Tort Ins. L.J. 57, 59. As coverage was provided only if a listed cause was the *only* cause of the collapse and not if an unlisted cause contributed to the collapse, the express language of the Deluxe form precluded coverage for a tank collapse caused by faulty welds and the weight of the tank contents. Therefore, South-

side's and Reclaim's assignment of error is overruled, and we affirm that portion of the summary judgment from which Southside's and Reclaim's cross-appeals derive.

## Coverage Under the Custom Form

{¶ 24} In its first assignment of error, C & F contends that the trial court erred in denying its motion for partial summary judgment and in concluding that collapse coverage was available to Southside and Reclaim under the Custom form. The form was marketed by C & F in late 1999, before the collapse. The coverage provisions of the Custom form differed from the coverage for collapse in the Deluxe form. The collapse section of the new form stated the following:

{¶ 25} "(1) We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is *caused by one or more* of the following: * * *

{¶ 26} "(b) Hidden decay; * * *

{¶ 27} "(d) Weight of people or personal property; * * *

{¶ 28} "(f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and *is caused in part by a cause of loss listed in (1)(a) through (1)(e)*, we will pay for the loss or damage even if use of defective material or methods, in construction, remodeling or renovation, contributes to the collapse." (Emphasis added.)

{¶ 29} By its plain language, the Custom form offered coverage for Southside and Reclaim's claim that the collapse was caused in part by the weight of the Uran 28 and in part by defective welding. The inclusion of the Custom form collapse coverage depended upon a provision of the Deluxe form—the liberalization clause. The clause stated that "[i]f we adopt *any revision* that would broaden coverage under this Coverage Part *without additional premium* within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part." (Emphasis added.) Because the trial court determined that the Custom form was a revision of the Deluxe form and that the $75 charge was not an additional premium, it concluded that the liberalization clause mandated the application of the Custom form's collapse coverage to Southside's loss.

{¶ 30} C & F maintains that the Custom form was not a revision of the Deluxe form but was an alternative; that is, after the fall of 1999, a customer could purchase either form coverage. It also maintained that any customer that wanted the Custom form coverage had to pay an "additional premium" of $75.

{¶ 31} While C & F's vice president for underwriting asserted that the Custom form was not a revision but the provision of separate coverage, "[t]he type of policy is determined by the type of coverage provided, not the label affixed by the insurer." *Selander v. Erie Ins. Group* (1999), 85 Ohio St.3d 541, 546, 709 N.E.2d 1161. It is undisputed that the Custom form, as the vice president noted, "broadened" and "expanded" the coverage for collapse. In its filing with the Department of Insurance, C & F indicated that the Custom form was a revision by placing a check mark in the box next to the word "revision" and leaving blank the box next to the word "new."

{¶ 32} C & F's argument that the $75 charge was an additional premium—the additional cost to Southside for obtaining the collapse coverage under the Custom form—must fail. C & F's Department of Insurance filings stated that any additional premium for the Custom form coverage was "N/A" or not applicable. The annual premium paid by Southside for the Deluxe form and CGL coverage was in excess of $245,000. Even viewing the inferences to be drawn from the underlying facts in a light most favorable to C & F, we hold that it was not reasonable to conclude that the $75 constituted an additional premium for the substantial coverage associated with the provision of concurrent-causation coverage under the Custom form. The only reasonable inference was that the $75 was not a premium for extended coverage but rather was an administrative or filing fee. Therefore, the trial court correctly entered judgment for Southside and Reclaim on their claim for coverage under the Custom form. C & F's first assignment of error is overruled.

### The Pollution–Exclusion Clauses

{¶ 33} In its fourth assignment of error, C & F asserts that the trial court erred in holding that the escaped Uran 28 was not a "pollutant" within the meaning of the policy language and thus, as a matter of law, that Southside was entitled to cleanup costs and third-party property-damage claims under the policies of insurance. The CGL section of the policies contained an exclusion for claims by third parties for property damage arising out of "the discharge, disposal, seepage, migration, release or escape of 'pollutants.' "[2] The exclusion in the Custom form also imposed a $25,000 limit on the expenses that Southside could recover for having to "extract 'pollutants' from the land or water at the described premises if the discharge, disposal, seepage, migration or release or escape of the 'pollutants' is caused by or results from a Covered Cause of Loss

---

2. No party argues that the pollution-exclusion clauses operated to exclude all claims against C & F. See C & F's Appellant's Brief at 9; cf. *Selm v. Am. States Ins. Co.* (Sept. 21, 2001), 1st Dist. No. C–010057, 2001 WL 1103509; see, also, *Rybacki v. Allstate Ins. Co.,* 9th Dist. No. 03CA0079–M, 2004-Ohio-2116, 2004 WL 894406.

that occurs during the policy period." The Deluxe form had similar language. All the polices defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

{¶ 34} Southside argues that the pollution-exclusion clauses were ambiguous and did not preclude damage claims for the collapse.[3] C & F contends that the claims resulting from the release of 990,000 gallons of chemicals from an industrial site was precisely what that the pollution-exclusion clauses were designed to preclude.

{¶ 35} The trial court reached its conclusion that the exclusions did not apply on two grounds. First, the court held that, as a matter of law, the clauses were ambiguous because Uran 28 was not specifically enumerated as a pollutant. The court relied upon the Ohio Supreme Court's then-recent decision in *Andersen v. Highland House Co.* (2001), 93 Ohio St.3d 547, 757 N.E.2d 329, interpreting the same pollution-exclusion language.

{¶ 36} In *Andersen,* the Supreme Court noted that the insurer did have "a duty to defend and indemnify the insureds because the policy language in question does not clearly, specifically, and unambiguously state that coverage for [the release of] carbon monoxide * * * is excluded." Id., 93 Ohio St.3d at 548, 757 N.E.2d 329. Because the exclusion "never clearly exclude[d] claims for deaths or injuries caused by * * * carbon monoxide poisoning," the Supreme Court held that the policy did not plainly exclude the claim from coverage and that the claim was covered. Id., 93 Ohio St.3d at 549, 757 N.E.2d 329. In this case, the trial court held that since the policy language did not "clearly, specifically and unambiguously" declare liquid Uran 28 to be a pollutant, the plain meaning of the exclusion language did not deny coverage to Southside.

{¶ 37} The trial court's holding, however, was based upon a misapplication of *Andersen.* The carbon monoxide released in *Andersen* was from a malfunctioning residential heater in an apartment. See id., 93 Ohio St.3d at 547, 757 N.E.2d 329. In its analysis, the court struggled to determine whether the released carbon monoxide was the equivalent of environmental pollution at an industrial site—the costs of which the pollution-exclusion clause was designed to limit.

{¶ 38} Pollution exclusions have existed in CGL policies since the 1970s in response to the insurance industry's concern about costly environmental-damage

---

3. In his March 4, 1999 memorandum to Southside management, attached as an exhibit to his deposition testimony, Southside's comptroller, Eric Thomas, summarized recent meetings to renew insurance coverage. He said that the company's insurance agents had proposed that Southside add "a pollution policy" to its coverage. Thomas noted that "[t]his would cover [Southside] in the event we have an environmental accident on the premises." Southside refused the coverage because of its $9,000 cost.

claims. See id., 93 Ohio St.3d at 549–550, 757 N.E.2d 329. The early exclusions denied coverage for intentional discharges but provided coverage for "sudden and accidental" releases of toxic pollutants " 'into or upon land, the atmosphere or any watercourse or body of water.' " *MacKinnon v. Truck Ins. Exchange* (2003), 31 Cal.4th 635, 644, 3 Cal.Rptr.3d 228, 73 P.3d 1205, quoting *Am. States Ins. Co. v. Koloms* (1997), 177 Ill.2d 473, 491, 227 Ill.Dec. 149, 687 N.E.2d 72. As courts and government regulation began to hold that the earlier exclusions did not preclude coverage for gradual pollution, the policy language was changed. The 1986 revision of the pollution-exclusion clause to its current form was intended to clarify the limitation of coverage and "was designed to bar coverage for gradual environmental degradation of any type and to preclude coverage responsibility for government-mandated cleanup[s]." *Andersen*, 93 Ohio St.3d at 550, 757 N.E.2d 329 (citations and internal quotation marks omitted). Despite the revisions, "[e]ven commentators who represent the insurance industry recognize that the broadening of the pollution exclusion was intended primarily to exclude [coverage for] traditional environmental pollution rather than all injuries from toxic substances." *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th at 644, 3 Cal.Rptr.3d 228, 73 P.3d 1205.

{¶ 39} For example, in determining whether pollution exclusions plainly and clearly excluded ordinary acts of negligence involving spraying pesticides to eliminate yellow jackets at a housing complex, the California Supreme Court held that the pollution exclusion of a CGL insurance policy was limited to injuries arising from events commonly thought of as environmental pollution. The terms "discharge, dispersal, release, or escape" in conjunction with "pollutant" commonly referred to the sort of conventional environmental pollution at which the pollution exclusion was primarily targeted. See *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205.

{¶ 40} Based on the history and original purposes of the pollution exclusion, the Ohio Supreme Court, reasoning that the release from a malfunctioning heater did "not remotely resemble traditional environmental contamination," held that carbon monoxide released from the heater was not a pollutant under the pollution exclusion of a commercial general liability policy unless specifically enumerated as such. *Andersen*, 93 Ohio St.3d at 552, 757 N.E.2d 329, quoting *Vantage Dev. Corp. v. Am. Environment Technologies Corp.* (1991), 251 N.J.Super. 516, 525, 598 A.2d 948. The court did not hold that the pollution exclusion was so broad as to be meaningless.

{¶ 41} We agree with the Ninth Appellate District that "the case of an internal heater emitting carbon monoxide within the atmosphere of residential living quarters does not equate to the environmental degradation of a pollutant leak." *Rybacki v. Allstate Ins. Co.*, 9th Dist. No., 2004-Ohio-2116, 2004 WL 894406, at

¶ 11. But the sudden escape of 990,000 gallons of liquid Uran 28 from a collapsed storage tank on an industrial site does equate to a traditional release of a pollutant into the environment.

{¶ 42} When the intent of the parties to an insurance contract is evident from the clear and unambiguous language in the agreement, a court must enforce the contract as written and give the words their plain and ordinary meaning. See *Hybud*, 64 Ohio St.3d at 665, 597 N.E.2d 1096. To determine the intent of the parties, an exclusion must be interpreted as applying to that which is clearly intended to be excluded. See id. Therefore, the trial court erred in holding that, as a matter of law, the pollution-exclusion clause did not apply in this case because the policy did not specifically enumerate Uran 28 as a pollutant.

{¶ 43} The trial court also based its summary-judgment ruling upon what it characterized as C & F's failure to fulfill its "reciprocal burden of specificity" in setting forth "specific facts" showing that a triable issue of fact existed on the pollution-exclusion claim. See *Dresher v. Burt* (1996), 75 Ohio St.3d at 293, 662 N.E.2d 264. The trial court noted that there was "no evidence" that the liquid Uran 28 was an irritant or a contaminant, which was the essential predicate for being a pollutant under the policies; that the escaped Uran 28 damaged other products; that any "cleanup" was required; or that any efforts were required to contain the Uran 28 in the Ohio River.

{¶ 44} In reaching the conclusion that no genuine issue of material fact remained to be resolved in C & F's favor, the trial court disregarded the testimony of C & F's expert witness, who, after a review of Southside's own documents, concluded that the Uran 28 was an irritant or contaminant. The trial court also relied upon the affidavit of Southside comptroller Eric Thomas, attached to Southside's motion for partial summary judgment on the pollution issue, to conclude that the escaped Uran 28 caused no damage to third parties and that no river cleanup was required.

{¶ 45} We note that the affidavit contradicted Thomas's earlier deposition testimony that third-party claims included the $250,000 charged by Southside's spill-response contractor for site cleanup, fees charged by the city of Cincinnati for fire, police, and street services, the cost of replacing the lost Uran 28 for PCS, and the $1,000 charged by downstream municipalities for the added chemicals they employed to treat their drinking-water supplies. Thomas also testified that the authorities had required the placement of booms on the Ohio River to contain spilled Uran 28 and spilled diesel fuel from the tractors washed into the river.

{¶ 46} While this court has long held that a nonmoving party may not defeat a motion for summary judgment by filing an affidavit that directly contradicts prior deposition testimony, in this case the factual disputes in Thomas's statements did

not affect the application of the pollution exclusion. See *Bullock v. Intermodal Transp. Serv., Inc.* (Aug. 6, 1986), 1st Dist. No. C–850720, 1986 WL 8519; see, e.g., *Linder v. Am. Natl. Ins. Co.*, 155 Ohio App.3d 30, 2003-Ohio-5394, 798 N.E.2d 1190, at ¶ 14. The mere existence of factual disputes between the parties, however demonstrated, does not necessarily preclude summary judgment. Only disputes over genuine factual matters that affect the outcome of the suit will properly preclude summary judgment. See *Gross v. Western–Southern Life Ins. Co.*, 85 Ohio App.3d at 666–667, 621 N.E.2d 412, citing *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202. Here, there were no genuine issues of material fact remaining to be resolved over whether Uran 28 was a pollutant as that term was unambiguously defined in the exclusion clauses: "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." It was undisputed that Uran 28 was a liquid. Southside's own records demonstrate that the escaped liquid was an aqueous solution of ammonium nitrate and urea. C & F's collapse expert testified that Uran 28 was an irritant and a contaminant. These facts were undisputed by competent evidence. Even construed in a light most favorable to Southside, the Thomas affidavit and other materials only highlighted factual disputes over the extent of third-party claims and cleanup efforts. Therefore, C & F's fourth assignment of error is sustained.

## TRIAL ASSIGNMENTS OF ERROR

{¶ 47} After the resolution of the motions for partial summary judgment, the trial court isolated one factual issue for resolution by the jury: Whether the tank collapse was "caused in part" by "the weight of personal property," that is, the Uran 28 contents of the tank. The resolution of this remaining factual issue would determine whether, under the policy language of C & F's Custom form, C & F would have to pay for the covered damages surrounding the tank collapse. The policy provided coverage if the weight of the tank contents, a listed factor, was one of the contributing causes of the collapse.

{¶ 48} In two related assignments of error, C & F asserts that the trial court erred in permitting the jury to consider whether the tank as it was filled with Uran 28—an expected and normal condition—could have been a cause of the collapse. Following two hours of deliberation, the jury returned a verdict that the weight of the Uran 28 in the tank was a partial cause of the collapse.

### Motion for Directed Verdict

{¶ 49} In C & F's second assignment of error, it alleges that the trial court erred in denying its motions for a directed verdict on the single issue reserved for trial. C & F contends that, as in a tort claim, the normal or

intended use of a device cannot be a legal cause of an accident or occurrence. C & F contends that as both experts, Dr. McGarry and Dr. Bardes, agreed that filling the tank with 990,000 gallons of liquid was a normal condition for the tank, there was no factual dispute to send to the jury. We disagree.

{¶ 50} "A motion for a directed verdict does not present a question of fact or raise factual issues, but instead presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence." *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, paragraph one of the syllabus. In ruling on a motion for a directed verdict, which presents only a question of law, a court may not consider the weight of the evidence or the credibility of the witnesses. Rather, the court may direct a verdict only if, after construing the evidence most strongly in favor of the nonmoving party, it determines that reasonable minds can come to but one conclusion on any determinative issue and that conclusion is adverse to the nonmoving party. See Civ.R. 50(A); see, also, *Ruta v. Breckenridge–Remy Co.,* paragraph one of the syllabus; *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467; *Bucher v. Sibcy Cline, Inc.* (2000), 137 Ohio App.3d 230, 237, 738 N.E.2d 435. This requires the court to determine only whether there exists any evidence of substantial probative value in support of the nonmoving party's claim. See *Ruta v. Breckenridge–Remy Co.,* 69 Ohio St.2d at 69, 23 O.O.3d 115, 430 N.E.2d 935. If there is evidence that, if believed, would permit reasonable minds to come to different conclusions, the issue must be submitted to the jury. See Civ.R. 50(A); see, also, *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 327, 587 N.E.2d 825; *Pelletier v. Rumpke Container Serv.* (2001), 142 Ohio App.3d 54, 60, 753 N.E.2d 958.

{¶ 51} Here, there was evidence of substantial probative value in support of Southside's claim that the weight of the tank's contents was a partial cause of the collapse. C & F mischaracterized Dr. Bardes's testimony as being in agreement with that of its expert, thus removing a factual dispute for the jury to resolve. In cross-examination, Dr. Bardes admitted that "in most cases" a normal condition of operation was not a cause of failure. But he testified at length that *this* collapse was caused by the combination of defective welds and the stress level resulting from the presence of 990,000 gallons of Uran 28 solution in the tank— the determinative issue in Southside's claim. The impact of effective cross-examination that reduces, but does not destroy, the credibility or the weight of an expert's testimony creates an issue of fact for the jury to decide. See *Nichols v. Hanzel* (1996), 110 Ohio App.3d 591, 602, 674 N.E.2d 1237. From Dr. Bardes's testimony, a jury could reasonably have concluded that the weight of the tank contents was a cause-in-part of the collapse, a conclusion different from that if the jury were to believe Dr. McGarry's testimony. Therefore, the issue was one to

be submitted to the jury. Accordingly, we overrule C & F's second assignment of error.

## Jury Instruction

{¶ 52} C & F finally asserts, in its third assignment of error, that the trial court erred in instructing the jury that the fact that the tank was holding a volume of Uran 28 that it was designed to hold does not prevent the weight of [the liquid] from being a cause of the collapse * * *. This instruction, C & F contends, made over its strenuous objection, encouraged the jury to disregard its expert's testimony that the normal or intended use of a device cannot be a cause of an accident or occurrence.

{¶ 53} A trial court should confine its instructions to the jury to the issues raised by the pleadings and the evidence. See *Becker v. Lake Cty. Mem. Hosp. West* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165. "A jury charge must be considered as a whole and a reviewing court must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." Id.; see, also, *Perez v. Falls Fin., Inc.* (2000), 87 Ohio St.3d 371, 376, 721 N.E.2d 47. In reviewing a jury charge, an appellate court must first consider whether the instruction was a misstatement of the law, and, if so, whether the erroneous instruction probably misled the jury. See *Dean v. Conrad* (1999), 134 Ohio App.3d 367, 369, 731 N.E.2d 212.

{¶ 54} Here, the jury charge addressed an issue raised by the testimony of both expert witnesses. Dr. Bardes, Southside's expert witness, repeatedly stated that the weight of a normally filled tank's contents could be a partial cause of the tank's failure. The jury instruction was not a misstatement of the law and accurately restated Dr. Bardes's contention. Nor did it preclude the jury from adopting the conclusion of C & F's expert. The instruction merely acknowledged the factual dispute between the experts and told the jury that the stipulated fact that the tank was nearly full did not "prevent" it from finding that the weight of the Uran 28 was a partial cause of the collapse; it did not require the jury to reach that conclusion. As the instruction served "to clarify the issues and the jury's position in the case," the trial court did not err in giving the requested instruction. *Dean v. Conrad,* 134 Ohio App.3d at 369–370, 731 N.E.2d 212. C & F's third assignment of error is overruled.

## CONCLUSION

{¶ 55} Because the trial court erred in holding, as a matter of law, that the pollution-exclusion clauses were ambiguous, we reverse its May 2002 rulings on the parties' cross-motions for partial summary judgment on that issue alone in C & F's appeal, No. C–030400. Because the trial court properly found coverage

under the Custom form only, we affirm the judgment from which Southside's and Reclaim's cross-appeals, Nos. C–030423 and C–030445, derive. Because we find no error in the trial court's denial of C & F's motion for a directed verdict and in the court's instructions to the jury on the issue of causation, we otherwise affirm the May 2003 judgment.

{¶ 56} On April 23, 2003, before the jury returned its verdict, the parties entered into a stipulation with respect to damages. The stipulation was journalized, and the trial court incorporated it into its May 12, 2003 judgment entry. The first three stipulations provided that Southside or Reclaim would recover various damages from C & F if the jury returned a verdict in their favor, and if various other conditions were met.

{¶ 57} Therefore, as the two conditions specified in paragraph one—a jury verdict in Southside's favor and a determination on appeal of coverage under the Custom form—have been met, Southside's recovery of $910,824 plus prejudgment interest is affirmed. As C & F was entitled to summary judgment in its favor on the pollution-exclusion issue, one of the conditions for Southside's recovery of an additional $333,351 in paragraph two of the stipulation has failed. Under the terms of the third paragraph, if, as occurred, the jury returned a verdict in its favor, and this court found coverage under the Custom form, Reclaim is entitled to recover $476,206 plus prejudgment interest from C & F.

{¶ 58} In paragraph four of the stipulation, C & F agreed to pay $4,082.31 to Southside "in full satisfaction and release of all obligations * * * with respect to any claims that have been, or may be in the future be [sic], asserted against Southside" because of the tank collapse. Under our holding on the pollution-exclusion clauses, C & F is not responsible for paying third-party claims against Southside. Here, however, the parties' agreement was in effect a settlement of any third-party claims, ratified by the trial court. This court will not disturb this settlement.

Judgment accordingly.

HILDEBRANDT, P.J., and PAINTER, J., concur.