NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0949n.06

No. 12-4468

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**NOV 0 4 2013**

**DEBORAH S. HUNT, Clerk**

|  |  |  |
|---|---|---|
| LINDA MENGELKAMP, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| LAKE METROPOLITAN HOUSING | ) | NORTHERN DISTRICT OF OHIO |
| AUTHORITY, *et al.*, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: KEITH and SUTTON, Circuit Judges; BLACK, District Judge.[*]

**BLACK, District Judge.** The district court granted Appellants Lake Metropolitan

Housing Authority ("LMHA") and Steven Knotts's motion for summary judgment on all

claims but for Appellee Linda Mengelkamp's retaliatory discharge claim, and the parties

tried that claim alone to a jury. R.59. Upon trial, the jury returned a verdict in favor of

Appellee, awarding compensatory damages of $195,000 against LMHA, and punitive

damages of $105,000 against Mr. Knotts. R.78.

Appellants argue that the district court's denial of summary judgment on Appellee's

retaliation claim was improper because: (a) Appellee failed to state a *prima facie* case for

retaliation; (b) the district court improperly instructed the jury as to Appellee's retaliation

claim by failing to accurately describe the proof required; (c) the district court's jury

---

[*] Hon. Timothy Black, United States District Judge for the Southern District of
Ohio, sitting by designation.

interrogatories on the issue of damages were improper because they failed to delineate back pay, front pay, and compensatory damages; (d) the punitive damages award against Mr. Knotts was improper because he was not an employer for purposes of imposing Title VII liabilities and the evidence at trial did not establish his liability; and (e) the district court's ensuing denials of Appellants' motion for a new trial and motion to alter or amend the judgment were therefore abuses of discretion.

We find the Appellants' assignments of error unavailing and thus we AFFIRM.

## I. BACKGROUND FACTS

Appellee worked as the Administrative Office Manager at LMHA from September 2009 until May 2010. R.31-1 at 5-6. As a new manager, Appellee was subject to a probationary period of one year from the date of her hire. *Id.* at 130. During the probationary period, the Executive Director, Steven Knotts, had the right to suspend or dismiss Appellee, and termination during this period could not be appealed to the Board. *Id.* At the time of Appellee's termination, she had been employed by LMHA for less than one year.

Appellee's duties as the Administrative Office Manager required her to foster positive attitudes toward agency goals and to serve as the EEO Coordinator. *Id.* at 67. Her duties also required her to exercise independent judgment and discretion, understand, interpret, and apply laws, rules, or regulations to specific situations, develop and maintain effective working relationships, and resolve complaints. *Id.* at 68. On March 8, 2010, Mr.

-2-

Knotts gave a positive performance review of Appellee. R.31-2 at 3-13; R.31-3 at 9-10, 20-21.

As of March 9, 2010, LMHA had not provided any training to Appellee about her responsibilities as the LMHA EEO officer. R.31 at 46. Nevertheless, on March 9, 2010, a LMHA employee, Patricia England, approached Appellee to complain about the manner in which Mr. Knotts had treated Ms. England at a managers' meeting that same day. *Id.* at 42-43. The entire LMHA management staff, including Appellee, attended the meeting. *Id.* According to Appellee, Ms. England claimed that Mr. Knotts was "discriminating against her because she was a female and she felt that he was being overly aggressive and confrontational towards her because of [her femaleness]" and "that he was not treating her fairly and the same as he did the male members of management." *Id.* at 43-44.

Ms. England, Mr. Knotts, and Appellee, without witnesses, discussed the allegation. *Id.* at 42. Appellee wrote notes, dated March 10, 2010, to memorialize the meeting. R.31 at 42, R.31-1 at 150.

Appellee's notes of the meeting indicate that Ms. England believed that Mr. Knotts was "targeting her" for being a "strong, intelligent female" and "attempting to undermine her authority as a Manager." *Id.* Ms. England believed that Mr. Knotts had pushed "under the rug" a safety issue that she had brought up in the managers' meeting. *Id.* According to Appellee's notes, Mr. Knotts asked Appellee if she agreed with Ms. England, and Appellee "agreed with Ms. England that the reaction was one of offense." *Id.* Appellee expressed her opinion that the "members of the management team should be free to bring up issues and concerns" at managers' meetings. *Id.* Her notes further state that Appellee told Mr. Knotts

- 3 -

that his "aggressive reactions toward issue [sic] are making some of the staff feel uneasy and if this behavior toward her does not stop she will be forced to contact the EEOC." *Id.* According to Appellee's notes, Mr. Knotts apologized, stated he was unaware that he had given offense, and all parties agreed to meet again in one month to review Ms. England's complaint and "determine if progress is being made." *Id.*

Appellee, in her deposition, testified that the one-month period was to allow the parties to determine if Mr. Knotts' treatment of Ms. England during the managers' meeting "happened to be a fluke." R.31 at 44. Appellee needed time to "pay more attention to interactions between [Ms. England and Mr. Knotts]," to find out if what happened on March 9 was a "bad day" or if it was a "pattern." *Id.*

On April 20, 2010, Erica Peavy, an LMHA employee, alleged that Scott Gleason, an outside contractor, had touched her inappropriately on LMHA property. *Id.* at 19-20. Appellee informed Mr. Knotts of the allegation and suggested that the accused individual be immediately removed from the property. *Id.* at 21-22.

Mr. Knotts met with Mr. Gleason and Tom Huth, the finance manager at LMHA who had been present when Mr. Gleason allegedly touched Ms. Peavy, to discuss the complaint made against Mr. Gleason, after which Mr. Knotts personally escorted Mr. Gleason off of the premises and told him not to return. R.31-3 at 61. Mr. Gleason had no further contact with LMHA employees. R.31-1 at 23-24, R.31-3 at 88.

The incident involving Ms. Peavy was the first time Appellee had ever handled such a sexual harassment complaint. R.31-1 at 30. Appellee sought help from LMHA's outside

- 4 -

human resources contractor, Sandy Conley of Clemans Nelson, a public sector labor relations and human resource consulting firm, for guidance as to how to proceed. *Id.* In accordance with Ms. Conley's direction, Appellee collected statements from employees and made recommendations to the agency. *Id.* at 27-28, 32-33. The agency implemented those recommendations. *Id.* at 88.

Appellee, however, took issue with Mr. Knotts' decision to discuss Ms. Peavy's complaint with Mr. Gleason and Mr. Huth. Appellee felt that Mr. Knotts had "given the impression of tainting the investigation" and had "given the appearance, whether true or not, of collusion." *Id.* at 23. Appellee did not believe a witness, Mr. Huth, should have been in the room when Mr. Knotts discussed the complaint with Mr. Gleason. *Id.* at 26. Tensions rose between Appellee and Mr. Knotts, as demonstrated by a review of the email exchange between them from May 3 through May 12, 2010. R.100 at 93-96; PX13.

In May 2010, LMHA's HCV Assistant Manager, Melissa Martin, informed Mr. Knotts that she had concerns regarding Ms. England. R.31-3 at 26; R.31-5 at 7-8. Ms. Martin indicated that she did not feel comfortable disclosing her concerns about Ms. England to Appellee, the human resources representative, because of Appellee's relationship with Ms. England. R.31-3 at 27-28; R.31-5 at 9-10. Mr. Knotts then asked Ms. Martin to prepare a written statement of her concerns. R.31-3 at 29; R.31-5 at 8.

In her statement, Ms. Martin discussed LMHA's lack of a "true" human resources department as employees did not feel comfortable taking their concerns to Appellee because her loyalty seemed to lie with Ms. England, not Mr. Knotts, in spite of Ms. England's lack

- 5 -

of professionalism, "blatant disrespect, and insubordination." R.31-2 at 19-20. Additional staff members also provided statements regarding Appellee's alleged unprofessional behavior. The employees described the toxicity of the relationship between Ms. England and Appellee, which allegedly resulted in a breakdown of communication and trust between Appellee and the staff. R.31-2 at 21-22, 24-27; R.31-3 at 29. The staff members also complained of Appellee's disruption of the LMHA working environment and failure to act in the best interest of the agency. R.31-2 at 24-29, 34-36.

Prior to these staff reports, Appellee discussed her conclusions and recommendation regarding the Peavey incident with Mr. Knotts. R.100 at 100. Within four days of that discussion, the staff had made the negative reports regarding Appellee and Mr. Knotts moved to terminate her. *Id.* On May 17, 2010, she received a Notice of Corrective Action. R.31-2 at 15-18. The stated reason for her termination was her alleged failure to treat employees with dignity, courtesy, professionalism and respect, insubordination and not following the oral and written directives of her supervisor, failure to satisfactorily perform her assigned duties, and failure to perform job responsibilities and conduct herself with honesty and integrity. *Id.* In an email to Sandy Conley two days prior, Mr. Knotts referred to the "gender issue" and "male v. female issue" with regard to the reasons for Appellee's termination. Appellee's Appendix at 51.

Appellee notified the Board of Commissioners of LMHA that she sought to appeal her termination. R.3 at ¶ 52. The initial hearing date of September 8, 2010 was canceled

- 6 -

and rescheduled for November 10, 2010. *Id.* at ¶ 53. Appellee thereafter abandoned her efforts to appeal her termination to the board. *Id.* at ¶ 54.

On September 22, 2010, Appellee filed a complaint with both the Ohio Civil Rights Commission ("OCRC") and the U.S. Equal Employment Opportunity Commission ("EEOC") claiming that LMHA retaliated against her on account of her participation in a protected activity. *Id.* at ¶ 11. On June 9, 2011, the OCRC issued a ruling of no probable cause. *Id.* at ¶ 12. On September 7, 2011, the EEOC also issued a ruling of no probable cause. *Id.* at ¶ 13.

In her complaint in district court, Appellee claimed that Appellants wrongfully discharged her because of her involvement with the sexual harassment and gender discrimination investigations. She sought recourse for alleged retaliation for her participation in the England and Peavy investigations and her opposition to the alleged conduct. *Id.* at ¶¶ 20-21, 26.

At the trial on Appellee's claim for retaliation, Mr. Knotts testified as to the procedure he routinely followed when discharging employees. R.100 at 189. This procedure included collecting documentation and providing it to the attorney for the LMHA Board of Commissioners, whose "concurrence" with the appropriate level of discipline was required. *Id.* at 190. Mr. Knotts did this every time an employee was discharged. *Id.* Sometimes, Mr. Knotts contacted LMHA's human resources contractor and its attorney would review the termination documentation prior to taking action. *Id.* Prior to making the decision to discharge Appellee, Mr. Knotts conferred with LMHA's attorney and LMHA's

- 7 -

human resources contractor to determine the appropriate course of action, as was routine procedure when terminating agency employees. *Id.* at 209, 211.

On the issue of damages, at the time of Appellee's termination in May 2010, she was earning an annual salary of $46,000. *Id.* at 110. In 2011, Appellee's salary at her new position with the Christopher Group was $54,580.10. *Id.* at 112. According to Appellee's expert witness, Appellee made more money at her then-current job than she had while employed by LMHA. *Id.* at 179-180. However, Appellee's benefits at her new position were significantly more limited, and she was required to pay out of pocket for her own health insurance and thus was unable to afford to avail herself of the pension benefits offered. *Id.* at 111-13. Appellee's expert testified that the value of the past loss of health insurance and pension benefit was $38,452 and that the loss of the health insurance and pension benefits over the next seven years was $69,199. *Id.* at 164-76.

At the close of trial, the district court, when instructing the jury, stated that Appellee claimed that Appellants terminated her because she "opposed a practice made unlawful by Title VII." R.101 at 334-35. The court instructed that Appellee, to prove her claim, must first demonstrate that she engaged in protected activity by "investigating and making recommendations" related to the England and Peavy incidents. *Id.* at 335.

Prior to trial, Appellants submitted two proposed jury instructions to the district court, numbered eight and nine, based on the allegations in Appellee's complaint that she was retaliated against for participating in investigations of gender discrimination and sexual harassment. R.49 at 12-14. After the district court denied Appellants' Motion for Summary

- 8 -

Judgment on the ground that Appellee opposed unlawful activity at LMHA, Appellants also submitted a supplemental opposition clause jury instruction to the court prior to trial. R.68.

At trial, counsel for Appellants objected to the court's instruction on the ground that the court had blurred the line on what actions constituted participation in an investigation and what actions constituted opposition under Title VII. R.101 at 346. Appellants argued that their proposed jury instructions numbered eight and sixteen were the correct statements of law. *Id.* The court overruled Appellants' objection to the jury instructions given. *Id.* at 347.

The trial court also defined compensatory damages, back pay, and front pay in its instructions. *Id.* at 337-39. The trial court submitted six interrogatories to the jury, two of which addressed compensatory damages. R.75 at 3. Interrogatory three asked whether Appellee was entitled to compensatory damages. *Id.* Interrogatory four asked what amount of compensatory damages were proper. *Id.*

Appellants proposed separate interrogatories for the separate categories of damages. R.69. Proposed interrogatory seven addressed back pay, proposed interrogatories eight and nine addressed front pay, and proposed interrogatories ten and eleven addressed compensatory damages. *Id.*

At trial, Appellants objected to the court's single interrogatory regarding the amount of compensatory damages. R.101 at 348. Appellants argued that the law requires that compensatory damages, front pay, and back pay must be separately considered, and

Appellants' proposed interrogatories were consistent with the court's instructions regarding damages. The trial court overruled Appellants' objection. *Id.*

Appellants ultimately filed a motion to alter or amend the judgment and a motion for a new trial, both of which were denied by the district court. R.82, 83, 93.

## II. ANALYSIS

### A. Denial of Appellants' Motion for Summary Judgment on Appellee's Claim for Retaliatory Discharge

#### 1. Standard of Review

In *Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011), the Supreme Court held that a party may not "appeal a denial of summary judgment after a district court has conducted a full trial on the merits." In that case, the Court also noted that once the case proceeds to trial, the full record developed in court supercedes the record existing at the time of the summary judgment motion. *Id.* However, "[d]espite summarizing its ruling in unfortunately broad language, the opinion in *Ortiz* was actually limited to cases where summary judgment is denied because of factual disputes" and "'*Ortiz* leaves open the possibility' that . . . purely legal claims 'may still be considered.'" *In re AmTrust Financial Corp.*, 694 F.3d 741, 750 (6th Cir. 2012) (citing *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012)).

Where review is appropriate, we review a denial of summary judgment *de novo*. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Therefore, we "examine . . . the record in the same manner as the district court." *Id.*; *see also Estate of Mills v. Trizec Properties,*

- 10 -

965 F.2d 113, 115 (6th Cir. 1992) (citing *Qualicare-Walsh, Inc. v. Ward*, 947 F.2d 823, 825 (6th Cir. 1991)).

According to FED. R. CIV. P. 56(c), summary judgment is appropriate when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.

Rule 56(c) mandates that summary judgment be entered against a party who fails "to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial responsibility of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The party opposing summary judgment cannot rest on the pleadings or merely reassert previous allegations, and it is insufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) requires the nonmoving party to present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.

- 11 -

The inquiry is whether the evidence presents a sufficient disagreement as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996).

## 2. Discussion

To state successfully a claim for retaliation under federal law, a plaintiff must establish that (1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action. *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). The analysis under Ohio law is identical. *Abbott v. Crown Motor Co., Inc.*, 348 F.2d 537, 541 (6th Cir. 2003).

An employee's activity is "protected" under the applicable federal and state law if the employee has "opposed any unlawful discriminatory practice" (the "opposition clause") or "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code" (the "participation clause"). *Veal v. Upreach LLC*, No. 11AP-192, 2011 WL 4986794, at *4 (Ohio Ct. App. 2011) (citing *HLS Bonding v. Ohio Civ. Rights Comm.*, No. 07AP-1071, 2008 WL 3522994, at *3 (Ohio Ct. App. 2008)).

Appellants argue that their motion for summary judgment was premised on statutory interpretation regarding the elements of a retaliation claim or, alternatively, on a determination of whether Appellee proved a *prima facie* claim for retaliation, and that both of these premises present purely questions of law. Appellants argue that Appellee's complaint did not allege that she *opposed* any unlawful activity, but simply that she *participated* in investigations, and, therefore, her claim must be evaluated according to the requirements of the participation clause. Appellants fail to recognize, however, that Appellee also alleged that she was retaliated against for *support* of claims of gender-based discrimination and sexual harassment. R.3 at ¶¶ 5, 26. The Supreme Court has held that "'[o]ppose' goes beyond 'active, consistent' behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 277 (2009). Given the evidence of Appellee's repeated confrontations with Mr. Knotts regarding his behavior, the district court properly found that Appellee's actions should be reviewed under the opposition clause, and that a factual dispute existed as to whether the non-discriminatory reasons offered by Appellants for Appellee's termination were pretextual. R.59 at 4. The district court's denial of summary judgment is therefore premised in part on disputed facts and, consequently, that part of its decision is not appealable per the Supreme Court in *Ortiz.* 131 S. Ct. at 889.

Even the portion of the district court's denial of summary judgment subject to our review, its interpretation of the opposition clause, is appropriately affirmed. Again, the

- 13 -

complaint alleged not only that Appellee investigated the charges, but also specifically that this action was brought for retaliation for *support* of claims of gender-based discrimination and sexual harassment. R.3 at ¶¶ 5, 26. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose is to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Conley v. Gibson*, 335 U.S. 41, 47 (1957). The complaint in this case fulfilled that purpose and gave fair notice that Appellee's actions resulting in retaliation went beyond simply conducting internal investigations.

Activities properly within the scope of the opposition clause are protected activities under Title VII whether or not formal charges of discrimination have been filed with the EEOC. *Sumner v. United States Postal Service*, 899 F.2d 203 (2nd Cir. 1990); *Sawicki v. American Plastic Toys Inc.*, 180 F. Supp. 2d 910 (E.D. Mich. 2001); *Harker v. Utica College of Syracuse Univ.*, 885 F. Supp. 378 (N.D.N.Y. 1995). In a case founded upon the opposition clause, it is irrelevant that such charges have not been filed.

Finally, to invoke protection under the opposition clause, Appellee does not have to prove that the conduct or policy she opposed was in fact an illegal employment practice. As stated in *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313-14 (6th Cir. 1989), "a person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful."

**B.     District Court's Jury Instruction Regarding Appellee's Retaliation Claim**

- 14 -

## 1. Standard of Review

The propriety of jury instructions is a question of law to be reviewed *de novo*. *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 365 (6th Cir. 2005). "[A] trial court is given broad discretion in wording its jury instructions and will not be reversed as long as the charge correctly states the substance of the law." *United States v. L'Hoste*, 609 F.2d 796, 805 (5th Cir.), cert. denied, 449 U.S. 833 (1980).

## 2. Discussion

The portion of the district court's instruction that the Appellants' Second Assignment of Error is based on reads as follows:

> Now, the plaintiff Mengelkamp claims that the defendant discriminated against the plaintiff because the plaintiff had opposed a practice made unlawful by Title VII of the Civil Rights Act of 1964. In order to prevail on this claim the plaintiff must show all of the following:
>
> First, that the plaintiff engaged in conduct protected by Title VII of the Civil Rights Act of 1964 by investigating and making recommendations regarding Patricia England's complaint of gender discrimination and by investigating and making recommendations concerning Erica Peavy's complaint of sexual harassment or both of these complaints.
>
> Linda Mengelkamp need not prove that the claims of employees England and Peavy were actually true. She must only prove that she was acting . . . under a good faith belief . . . that England may have been the victim of gender discrimination or that Peavy may have been the victim of sexual harassment at LMHA . . . .

R.101 at 334-35.

Appellants' main objection is that the instruction "blurred the line" between the opposition and participation clauses of Title VII for the purposes of proving that Appellee

- 15 -

was engaged in protected activity. Appellants argue that in pleading her retaliatory discharge claim, the only explicit charge made was that Appellee was discharged for her role in investigating charges made by England and Peavy, who never filed any charges with the EEOC. Appellants complete their argument by contending that since the Sixth Circuit does not recognize as protected activity internal investigations occurring outside of a filed EEOC charge, the actions of Appellee here never qualified as "protected" activity and cannot give rise to any claim for retaliation.

As discussed *supra*, however, when the district court denied Appellants' motion for summary judgment, the court explicitly found that "[b]oth federal and Ohio law prohibits an employer from discriminating against an employee for opposing sexual harassment or gender discrimination in the workplace. Mengelkamp says Appellants fired her for opposing just such practices." R.59 at 3. Rejecting Appellants' fixation on the participation clause, the court stated that "Mengelkamp's investigation and, more importantly, her efforts to stem and to remedy gender discrimination and sexual harassment at LMHA – including by threatening Mr. Knotts with an EEOC filing – are properly characterized as 'opposition' to unlawful employment practices." *Id.* at 6.

Activities properly within the scope of the opposition clause are protected activities under Title VII, whether or not formal charges of discrimination have been filed with the EEOC. *Sumner*, 899 F.2d at 203; *Sawicki*, 180 F. Supp. 2d at 910; *Harker*, 885 F. Supp. at 378. Moreover, "[a] person opposing an apparently discriminatory practice does not bear

- 16 -

the entire risk that it is in fact unlawful; he or she must only have a good faith belief that the practice is unlawful." *Booker*, 879 F.2d at 1313-14.

The district court therefore appropriately instructed the jury that Appellee's conduct "investigating and making recommendations" regarding the England and Peavy claims qualified as "protected activity" under Title VII. R.101 at 334-35. The case went forward on the basis that Appellee was engaged in protected activity because of her opposition to unlawful employment practices. The fact that this opposition took place as an outgrowth of internal investigations is a matter of circumstance. There is no reason to conclude that conducting an investigation and opposing unlawful activity are mutually exclusive.

The instruction at issue correctly states the substance of the law, given the procedural posture of the case, and does not constitute reversible error.

## C.     District Court's Failure to Submit Interrogatories to the Jury that Delineated Back Pay, Front Pay, and Compensatory Damages

### 1.     Standard of Review

A district court's decision to submit a proposed interrogatory to the jury is reviewed for abuse of discretion. *United States v. Hammon*, 277 F. App'x 560, 568 (6th Cir. 2008). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 467 (6th Cir. 2009) (citing *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004)).

- 17 -

## 2. Discussion

By the Appellants' own admission, the jury instruction given on back pay, front pay, and compensatory damages properly instructed the jury that they were to be calculated separately. As long as the instructions, together with the interrogatory, adequately inform the jury of the relevant considerations, there is no reason to challenge the court's discretion. *Fisher v. Ford Motor Co.*, 224 F.3d 570 (6th Cir. 2000). Here, as the jury was properly instructed on what to consider in separately calculating these damage awards, there is no harm in the simplified approach taken by the district court with regard to the interrogatory in question.

Appellants argue that without an interrogatory that specifically delineates the three separate damage awards, there is no way of determining if the award for front pay was "supported by a reasonable interpretation of the evidence" or if the federal statutory cap on the sum of punitive and compensatory damages is exceeded. As the trial court stated in reviewing Appellants' post-trial motion for a new trial, the Appellants' argument is two-pronged: first, that front pay damages were potentially unsupported by the evidence, and, secondly, that the lack of itemized damages precludes this Court from properly assessing the damages cap.

Appellants' argument that front pay damages may not be "supported by a reasonable interpretation of the evidence" is an attack on the weight of the evidence. Appellants argue that front pay could not be warranted because Appellee secured new employment within six months of her termination, at a salary comparable to what she had made at LMHA. But at

- 18 -

trial, Appellee testified that she has neither medical benefits nor pension benefits in her new position. Appellee's experts testified that her total economic loss, both past and future, came to $117,488. R.100 at 146-47, 164-76. Appellants were free to offer their own experts or to otherwise challenge this testimony, but they did not. A jury's award is to be accorded great discretion, *Rodgers v. Fisher Body Div.*, 739 F.2d 1102, 1107 (6th Cir. 1984), and there was ample evidence to warrant an instruction on front pay and justify the consideration of such damages by the jury.

The damage cap issue would be relevant if this case had only gone forward only as a federal claim under Title VII, since punitive plus compensatory damages would be limited by federal law to no more than $50,000. *See* 42 U.S.C. §1983a(b)(3)(A). That is not the case here, however, as Appellee also raised a corresponding claim under Ohio Revised Code §4112.02(I), and the parties stipulated as part of the final pretrial order that the action would go forward under both federal and state law. R.57 at 2.

Although the instructions given only referred to the requirements for a Title VII claim, instructions solely on federal claims can permit state law liability if the instructions are sufficient. *Hall v. Consol. Freightways Corp. of Delaware.*, 337 F.3d 669, 677 (6th Cir. 2003). The district court instructed the jury that punitive damages against Mr. Knotts would be appropriate only if he "personally acted with reckless indifference to plaintiff's federally protected rights." Under Ohio law, punitive damages may be recovered only upon a showing of "actual malice." *Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 558, 644 N.E.2d 397, 402 (1994). "Actual malice" is defined under Ohio law as "(1) that state of

- 19 -

mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Id.* This latter prong contemplates recklessly indifferent behavior and thus the instruction requiring a finding of reckless indifference was sufficient to permit state law liability.

Both the Supreme Court of Ohio and this Court have recognized that a claim under Ohio Revised Code §4112 mirrors one brought under Title VII, so both can be analyzed solely under Title VII. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (1981); *Abbott*, 348 F.3d at 541. Damages that are awarded in such an action may be distributed between the state and federal claim. *Abbott*, 348 F.3d at 541. Plaintiffs are entitled to elect under which statute they will receive damages, and where the state claim has no damage caps (or more generous ones), the Title VII limits do not apply. *Denhof v. City of Grand Rapids*, 494 F.3d 534, 548 (6th Cir. 2007).

Ohio law caps tort recoveries for non-economic losses at $250,000, and economic losses are not capped. Ohio Revised Code §2315.18(B)(2). Thus it matters little that the jury was not invited to break down its "compensatory" award of $195,000 into its component parts as, under any circumstance, the Ohio cap was not exceeded.

The record in this case supports a compensatory award of $195,000, and as that amount is well within the Ohio statutory cap, no prejudice resulted from the district court's

- 20 -

design of the jury interrogatories. The court was well within its discretion to instruct and craft interrogatories as it did.

## D. Punitive Damage Award

### 1. Standard of Review

The standard of review for an award of punitive damages is reasonableness. *Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990) (citing *Smith v. Wade*, 461 U.S. 30, 54 (1983)). Punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Hill v. Marshall*, 962 F.2d 1209, 1217 (6th Cir. 1992) (citing *Smith*, 461 U.S. at 56).

### 2. Discussion

The Supreme Court has held that "malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536-37 (1999). To be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 536. "[A] positive element of conscious wrongdoing is always required." *Id.* at 538. An employer does not have the requisite state of mind if it "discriminated with the distinct belief that its [alleged] discrimination is lawful, even if that belief is erroneous." *Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 561 (S.D.N.Y. Feb. 8, 2008) (quoting *Kolstad*, 527 U.S. at 538). However, "[e]gregious or outrageous acts may serve as evidence supporting an inference of such evil motive." *Kolstad*, 527 U.S. at 527.

-21-

As the district court stated when ruling on Appellants' motion to alter or amend the judgment under Rule 59(e):

> [T]he evidence adduced at trial supports a finding that Mr. Knotts consciously disregarded Plaintiff Mengelkamp's rights. Knotts was tasked with acting upon Mengelkamp's investigations into human resources complaints, and yet still engaged in retaliatory conduct. The evidence further supports a finding that Knotts' actions were "outrageous" and "flagrant," so as to militate against upsetting the jury's verdict. *Pelletier v. Rumpke Container Serv.*, 753 N.E.2d 958, 964-65 (Ohio Ct. App. 2001). An agency's head, investigating allegations of gender harassment decides to punish the messenger instead. It is not plainly erroneous to conclude that so doing constitutes outrageous behavior within the ambit of Ohio's punitive damages scheme.

R.93 at 6. Under this view of the evidence, apparently shared by the jury, the fact that Mr. Knotts "followed protocol" and consulted with the agency's legal counsel is of little probative value. Mr. Knotts made the decision to terminate Appellee and he was the one motivated to retaliate against her. R.100 at 243.

Finally, Mr. Knotts is appropriately considered an "employer" for purposes of Title VII liability. An individual qualifies as an "employer" under Title VII if he (1) serves in a supervisory position, (2) has "significant control over plaintiff's hiring, firing, or conditions of employment," and (3) is "the ultimate authority over [the plaintiff's] employment and working conditions." *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993). The record evidences that Mr. Knotts held a supervisory position, that he had significant control over Appellee's firing, and that he was the person in charge of Appellee's employment conditions.

Consequently, the evidence sustains the punitive damage award.

- 22 -

**E.    District Court's Denial of Appellants' Post-Trial Motions for a New Trial or to Alter or Amend the Judgment**

**1.    Standard of Review**

A court's denial of a motion for a new trial pursuant to FED. R. CIV. P. 59(a) is reviewed for an abuse of that discretion. *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989) (citing *Whittington v. New Jersey Zinc Co.*, 775 F.2d 698 (6th Cir.1985)); *Huff v. Metropolitan Life Ins. Co.*, 675 F.2d 119, 122 (6th Cir. 1982).

**2.    Discussion**

As none of the Appellants' assignments of error are availing, the denial of their motions for a new trial and to alter or amend the judgment do not represent abuses of discretion.

**VI. CONCLUSION**

For the foregoing reasons, we affirm.