[Cite as *TRAX Constr. Co. v. Reminderville*, 2021-Ohio-3481.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| TRAX CONSTRUCTION CO., | CASE NOS. 2020-L-113 |
| | 2020-L-127 |
| Plaintiff-Appellee, | 2021-L-008 |
| - v - | |
| VILLAGE OF REMINDERVILLE, | Civil Appeals from the |
| | Court of Common Pleas |
| Defendant-Appellee, | |
| OHM ADVISORS, et al., | Trial Court No. 2018 CV 000184 |
| Defendants-Appellants. | |

**O P I N I O N**

Decided: September 30, 2021
Judgment: Affirmed

*O. Judson Scheaf, III, Jeffrey A. Yeager*, and *Elise K. Yarnell*, Hahn Loeser & Parks LLP, 65 East State Street, Suite 1400, Columbus, OH 43215, and *Andrew J. Natale* and *Aaron S. Evenchik*, Hahn Loeser & Parks LLP, 200 Public Square, Suite 2800, Cleveland, OH 44114 (For Plaintiff-Appellee).

*Angela F. Lohan*, Village of Reminderville Law Director, 3382 Glenwood Boulevard, Reminderville, OH 44202 (For Defendant-Appellee).

*Michelle A. Thomas,* Dickie, McCamey & Chilcote, P.C., 89 Kercheval Avenue, Grosse Pointe Farms, MI 48236, *Paul J. Schumacher* and *Kristin L. Wedell*, Dickie, McCamey & Chilcote, P.C., 600 Superior Avenue East, Fifth Third Center, Suite 2330, Cleveland, OH 44115, and *George S. Coakley* and *Richard T. Lobas*, Coakley Lammert Co., LPA, 20600 Chagrin Boulevard, Suite 1100, Cleveland, OH 44122 (For Defendants-Appellants).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellants, OHM Advisors ("OHM"), et al., appeal from the judgment of the Lake County Court of Common Pleas, after a trial by jury, in favor of appellee, TRAX Construction Co., which awarded appellee $1,061,551.84 in compensatory damages, $325,000 in punitive damages, and $483,870.53 in attorney fees. We affirm.

{¶2} TRAX is a construction company specializing in excavating, repairing, and replacing underground utilities. By way of its owner and president, Christopher Valletto, TRAX contracted with appellee, the Village of Reminderville ("Village"), to perform underground utility construction work, including a new sanitary-force main, a new water main, and new storm sewers ("the Project"). The contract bid was for $2,078,000 and was based upon a specified work schedule which was originally set to commence on June 12, 2017 and finish on October 31, 2017. At a preconstruction meeting, the parties confirmed that the city of Cleveland and Summit County would be involved in inspecting and paying for a portion of the work, and that all contractor pay requests and change orders (work added to or deleted from the original contract) had to be submitted to OHM, the engineering firm used by the Village, for processing before submission to the Village for final approval.

{¶3} OHM engineer Chad Lewis assisted OHM in drafting the design. According to Mr. Lewis, TRAX was entitled to rely upon the plans set forth in the design, in particular the location of the utilities to be replaced or repaired as depicted in the design. Appellant-Eugene Esser, an engineer for OHM, acted as the Project Manager and as well as the contractual liaison between TRAX and the Village (Mr. Esser was designated as the Village's engineer outside of his work on the project). Mr. Scott Hines was OHM's construction manager and was the main point of contact between TRAX and OHM.

2

According to Mr. Valetto, all communications went through Mr. Hines who was in direct contact with Mr. Esser.

{¶4} Mr. Esser, along with the Village, were responsible for establishing funding for the Project. According to the Village's Mayor, Sam Alonso, the Village relied upon OHM to properly administer the contract; and, if something noteworthy or important occurred or failed to occur during the course of the Project, the Mayor maintained the Village expected OHM to contact him and/or the Village council to discuss such matters.

{¶5} When TRAX began excavation for the Project, it discovered the project design was flawed; initially, the utilities depicted in the design were not in the location identified. Mr. Hines subsequently advised TRAX to move further down the line as depicted on the plan to address what was shown to be an abandoned water line. When TRAX located this line, it discovered it was not abandoned and, due to certain regulations relating to excavating live lines, the plan needed to be revised. According to Mr. Valletto, the postponement required TRAX to remain on the job and incur additional time and resource costs. OHM, via Mr. Lewis, admitted that TRAX was entitled to rely upon the design plans, including utility locations. And Mr. Lewis conceded the actual utility locations were different than those depicted on the design plan.

{¶6} In light of the construction delay, TRAX, via Mr. Jeffrey Busch (TRAX's Project Manager), Mr. Valletto, or other representatives, provided OHM, Mr. Hines, Mr. Esser, and the Village with numerous written correspondences requesting, inter alia, progress meetings to discuss factors impacting the project due to the postponement(s) and what was eventually characterized as an "indefinite standby." Overall, some 16 letters were sent between August 3, 2017 and February 23, 2018 – Ultimately, only two

3

Case Nos. 2020-L-113, 2020-L-127, 2021-L-008

progress meetings were held (the first on October 30, 2017 and the second occurring on November 28, 2017); and, although on-site verbal communications took place, OHM sent a written response to only two of TRAX's letters.

{¶7}    After the first issue causing the re-design, Mr. Valleto stated that Mr. Hines directed TRAX to continue to remain on site to complete the workable aspects of the Project.  And, with respect to TRAX's concerns about significant additional expenses accumulating due to the delays and "standbys," Mr. Valleto asserted Mr. Hines assured him TRAX would be paid for its additional incurred costs.  Although nothing in writing was offered to confirm this conversation, Mr. Hines assured Mr. Valletto "his word has value." TRAX accordingly submitted change orders for the additional work to confirm the changes and ensure payment.  According to Mr. Valletto, however, as of November 28, 2017, nearly a month beyond the initial, contractual completion date, TRAX had not received any payment from the Village.  Had TRAX been told it was not going to be paid for the additional time and work, Mr. Valletto stated it would have stopped work immediately.

{¶8}    As of late November 2017, Mr. Valletto stated TRAX had explained to the Village, via letter and verbal exchanges, the problems it was experiencing due to the inability to move forward.  Specifically, TRAX, through Mr. Valletto, advised the Village and OHM:  "we are continually being damaged by our equipment and manpower out there on the project well beyond the completion time and that we are also financing the project and financing additional work that we've been assured payments on and that's basically what we are telling them and that we are tracking these costs."  According to Mr. Valletto, no representative of the Village or OHM disputed these points.  Indeed, during this timeframe, a point at which construction would be slowed due to potential weather

4

Case Nos. 2020-L-113, 2020-L-127, 2021-L-008

interference, no agent of the Village or OHM advised TRAX to leave the site to avoid further time-and-resource costs.

{¶9} Considering the lack of payment and additional expenditures, TRAX made a public-records request asking the Village to produce all files, including emails and text messages, relating to the changes to the project design, additional-cost claims submitted by TRAX, and the "positions that exist between the Village and its design engineer." TRAX stated it required this information in the event it "must escalate the matter to recover the compensation due." TRAX received no response to the request.

{¶10} On December 12, 2017, nearly six weeks after the original, scheduled completion date, TRAX sent a letter to Mr. Hines, OHM, and the Village regarding a change order and pay application which did not account for its completed work. The letter noted the Village would be in material breach of the contract by failing to timely process payment requests for work performed. On the same date, Mr. Hines sent TRAX a letter indicating the Village and OHM would be addressing only an extension of time for the Project's completion and nothing else. The letter also stated that, due to, among other things, the winter weather, the Village was putting a work hold on certain aspects of the Project.

{¶11} In Mr. Valletto's view, the representations in Mr. Hine's letter implied that unless TRAX cooperated with OHM on its terms, it would not be paid. TRAX subsequently responded requesting further clarification of the Village's and OHM's intentions and advised the Village if it desired to terminate TRAX for convenience from the Project (pursuant to the contract), it would need the proper paperwork to minimize the

5

cost. According to Mr. Valletto, TRAX received no written response from either the Village or OHM and no meeting was arranged or held.

{¶12} On December 27, 2017, TRAX sent the Village and OHM a letter advising that it had not been paid for base contract work and had been unable to confirm the processing of pending payment applications. The letter noted that OHM and the Village represented to TRAX "many weeks ago" that the applications had been submitted but, given the uncertainty and delay, TRAX was concerned the applications were never sent. TRAX requested copies of the submission and any related paperwork regarding the payment applications. The letter also advised that TRAX had sent various letters to the Village and OHM regarding the absence of required design documents, certain interferences with work, and additional-cost claims associated with compensable delays. TRAX noted that despite repeated efforts to mitigate costs, the Village and OHM have failed and refused to follow the provisions of the original contract and timely process accurate payment applications. TRAX received no written response to this letter and no meeting was arranged or held.

{¶13} On January 22, 2018, TRAX, via Mr. Valletto, again wrote the Village and OHM. That letter advised that the Village's finance officer's certificate in the original contract was $897,000 and TRAX has, or will, surpass that level of costs. TRAX expressed serious concern regarding the uncertainties surrounding the certified financing and noted it had endeavored to meet with the Village and OHM but received no response. TRAX stated it was entitled to a revised certificate showing the entire amount of the contract bid. Meanwhile, the letter advised TRAX will not work, and is not required to work beyond the amount certified. TRAX also reminded the Village that it was in breach

6

of the contract relating to its failure to respond to its pending change orders for payment, as well as the Village's and OHM's failure to act which prevented performance under the contract. If the Village or OHM disputed any change orders, TRAX requested a meeting. TRAX requested the Village and OHM to respond by the close of business on Friday, January 26, 2018. Mr. Valletto stated he did not receive a response to this letter and no meeting was arranged.

{¶14} Mr. Valletto pointed out that the Village finance officer's certification essentially ensures that funds are available to pay a contractor for work completed. Because the project had went in an unexpectedly bad direction for TRAX, Mr. Valletto and his associates revisited the contract and found the funds certified, $897,000, were far lower than the $2,078,000 accepted by the Village on TRAX's bid. He noted this discovery was "a big alarm button for us." As such, if TRAX performed more than $897,000 of actual work, it was at risk of not being paid beyond that amount. Thus, TRAX requested the Village to recertify the funds to an amount that would be sufficient to cover expenses to date. Mr. Valletto ultimately admitted he did not fully review the fund-certification aspect of the contract when he signed it on behalf of TRAX. He also admitted he would not have signed it had he known the certification was much lower than the bid.

{¶15} On January 29, 2018, OHM sent TRAX a letter, via Mr. Hines, which reiterated its December 12, 2017 statements. It also requested a written schedule for when TRAX intended to return to work on the project. TRAX subsequently responded to this request, stating it could not provide a schedule for returning to work because its billings have reached the limit of the finance officer's certificate in the contract. Moreover, TRAX pointed out that OHM had previously directed it to stop work and, without a

7

Case Nos. 2020-L-113, 2020-L-127, 2021-L-008

recertification, re-commencing work was not possible. In effect, TRAX stated "OHM is preventing TRAX's performance and delaying TRAX." TRAX demanded the Village and OHM to process its pending pay applications. Mr. Valletto stated he received no response to this missive.

{¶16} In light of the foregoing, on February 1, 2018, TRAX sent the Village and OHM a letter advising them that it had filed the underlying complaint and submitted a copy of the same. TRAX pointed out that, even though it had tried to work with both the Village and OHM, they essentially ignored all requests for meetings and failed to certify funds for further payments. TRAX stated it remained ready and willing to discuss the issues, but no further work would occur on the project. Also, TRAX emphasized that, because the project had not been recertified and its equipment and materials were sitting idle, the Village had commenced taking its materials. Mr. Valletto stated TRAX had a surplus of stone; the Village, however, without TRAX's permission, began using the materials to backfill potholes and trenches.

{¶17} In their complaint, TRAX alleged fraud/willful concealment, breach of contract, and theft/conversion against the Village; and, against OHM and Mr. Esser, it alleged fraud/willful concealment, negligence, and theft/conversion. The Village filed a counterclaim against TRAX and a cross-claim against OHM and Mr. Esser, seeking, in relevant part, indemnity and contribution from OHM and Mr. Esser.

{¶18} Subsequently, on April 11, 2018, the Village issued a funding certificate in the amount of $2,078,789.55. Later, on May 24, 2018, the Village terminated TRAX for convenience; at that point, TRAX had been paid $979,509.83 for the work it had performed.

8

{¶19} Meanwhile, the Village filed cross-claims against the OHM defendants seeking indemnity and contribution, with a supplemental cross-claim alleging negligence. The OHM defendants filed a motion to dismiss the complaint, alleging the economic-loss rule barred TRAX's tort claims. The trial court denied the motion and the matter proceeded to jury trial. TRAX subsequently moved for an order of spoliation and an adverse evidentiary presumption, asserting Mr. Esser had lost or destroyed a flash drive containing documents relating to the Project. The trial court denied TRAX's motion and issued an order in limine preventing reference to the alleged spoliation as well as the potential for an adverse inference.

{¶20} Beyond the facts set forth above, Mr. Esser testified that, while acting as OHM's project manager, OHM owed TRAX the duties to take ownership of mistakes, to deal fairly and honestly with it, and to act as a faithful agent, including keeping it fully informed. Mr. Esser stated that such duties also involve being fully informed and communicating with a client in various forms such as writing, email, and verbal contact. He testified that a project manager and engineer has an obligation to be truthful and neither conceal nor fail to disclose important information. Mr. Esser agreed that the foregoing standards applied to OHM's relationship with TRAX, and TRAX was entitled to rely upon him and OHM to adhere to these standards.

{¶21} Mayor Alonso testified that having the necessary money to fund a project is important, and TRAX was entitled to be concerned if sufficient funds had not been secured. He also agreed that if TRAX was on the project longer than expected, through no fault of its own, it is entitled to the requisite compensation. Moreover, Mayor Alonso agreed that TRAX kept OHM, at the very least, apprised of the entire time and costs it

9

had incurred on the project. And the mayor testified that the Village would remit payment to TRAX to the extent "everything looks good" (with respect to payment applications) to OHM. Mr. Valletto testified that, after the initial hold up due to problematic designs, Mr. Hines directed TRAX to go outside the project limits and proceed with additional work necessitated by the changes. And, even though, according to Mr. Valletto, OHM had repeatedly assured TRAX, via both Mr. Esser and Mr. Hines, it would be paid for the additional time and work, no such payment was promptly or obviously processed.

{¶22} Contrary to Mr. Valletto's testimony, Mr. Hines testified he did not assure TRAX it would be paid; instead, Mr. Hines observed that the applications relating to the change orders would be reviewed and decisions would be made accordingly. During its case in chief, TRAX submitted an email received in discovery which was written on December 12, 2017, by Mr. Hines to Terry Bowlin, a technician for OHM. The email related to TRAX submission of a change order as well as a "winter shutdown." The email additionally sought confirmation that certain materials related to the project can be stored on a baseball field because "[i]t is likely that the rebid will push the project past the start of the field being used." When questioned about "the rebid," Mr. Hines testified discussions had occurred that suggested TRAX might be pulling off the job. When pressed on this point, however, Mr. Hines stated that neither he nor OHM had discussed the possibility of a rebid with either TRAX or the Village. Although Mr. Hines testified no rebid would occur unless TRAX left the project, he also acknowledged that the winter months slowed, if not halted work. Further, even though OHM was discussing rebidding the job, Mr. Hines conceded there was no discussion at that point of terminating the

10

contract for convenience, a contractual tool that would allow either party to sever ties to the contract without issue or incurring further expense.

{¶23} In December 2017, Mr. Esser was transitioning into retirement and Thomas Tucker, a senior project manager and engineer for OHM, was assuming his role as Project Manager on the Project. In a December 22, 2017 email from Mr. Hines to Mr. Tucker (on which Mr. Esser, Mr. Lewis, and Mr. Bowlin were copied), Mr. Hines recommended they discuss "Reminderville verbally" because "[i]t is a different animal for which we do not sit in the zoo keepers chair." (sic.) Mr. Hines denied writing the email.[1] In light of this, OHM objected to the email's admission. The trial court, however, overruled the objection, ruling the jury should be permitted to consider and weigh the import of the email because it was in OHM's system, a point counsel for appellants later conceded.

{¶24} Mr. Esser additionally testified that he had removed certain project-related information on his company-issued computer after he retired. Although Mr. Esser saved the information to a flash drive, and agreed to save the information during his deposition, he later deleted it from the flash drive and, according to his testimony, saved it to a different computer. The information, therefore, whatever it may have been, was ultimately unavailable.[2]

{¶25} After each party rested, the trial court entered a directed verdict for OHM on TRAX's and the Village's negligence claims but denied a directed verdict on TRAX's fraud claims. The jury ultimately returned a verdict in favor of the Village on TRAX's fraud

---

1. Notwithstanding Mr. Hines' denial at trial, appellants appear to concede he wrote and sent the message at page 4 of their brief ("On 12/20/17, and in light of TRAX's escalating complaints and demands, Hines directed an email to Tucker indicating that they should discuss the [project] 'verbally' * * *.")

2. It was this information that prompted TRAX's motion regarding spoliation and an adverse inference.

Case Nos. 2020-L-113, 2020-L-127, 2021-L-008

claims and in favor of TRAX on the breach of contract claims but awarded zero damages for the Village's breach of contract. The jury found in favor of TRAX on the fraud claims against OHM and Mr. Esser. The jury also found in favor of the Village against OHM and Mr. Esser on its indemnity cross-claim. The jury found that TRAX's damages were caused exclusively by OHM/Esser due to their concealments and fraudulent actions on which TRAX justifiably relied. OHM and Mr. Esser moved for a judgment notwithstanding the verdict and a new trial, each of which were denied. As outlined above, the jury and judge eventually ordered damages and fees in an amount just under $1.9 million. This appeal follows.

{¶26} Appellants' first assignment of error provides:

{¶27} "The trial court committed reversible error by denying the motion to dismiss the complaint (9/13/18 judgment entry), the motion for directed verdict (TTr pp 648-649), and the motion for JNOV (10/21/20 journal entry) because the economic loss rule barred all tort claims by plaintiff TRAX against the OHM defendants."

{¶28} Appellants assert that the trial court erred, as a matter of law, in denying its various motions because the economic-loss rule barred all TRAX's tort claims, including the intentional tort of fraud, because their status as design professionals on the Project was not a sufficient nexus to substitute for privity under the contract between TRAX and the Village. Moreover, they argue they owed no general duty under tort law to protect TRAX from purely economic harm arising out of contractual obligations regarding the Project's design because this duty arose and was binding between OHM (and its agents) and the Village exclusively. In this respect, appellants maintain whatever allegedly reasonable reliance TRAX had on OHM's representations cannot serve as a substitute

12

for privity between TRAX and appellants. Finally, appellants contend that, even if the economic-loss rule does did not bar the fraud claim, Ohio law does not permit a contractor to evade contractual limitations by pleading fraud grounded upon an alleged breach of an ethical duty to disclose – the foundation, in appellants' view, for the jury's verdict in TRAX's favor.

{¶29} Initially, TRAX asserts appellants failed to preserve their arguments vis-à-vis the economic-loss rule because they (1) did not raise it as to fraud as part of their motion to dismiss; (2) did not raise it as part of their directed verdict motion; (3) failed to revisit its directed verdict motion at the conclusion of evidence; and (4) failed to raise the rule until its final reply in support of its motion for judgment notwithstanding the verdict.

{¶30} With respect to TRAX's first contention, a review of appellants' pretrial motion to dismiss the complaint demonstrates they raised the issue as to *all* tort claims. Although they did not specifically use the economic-loss-rule nomenclature, they did argue the complaint should be dismissed because TRAX was seeking purely economic damages in tort against OHM and Mr. Esser, parties with whom it had no privity of contract. In this respect, we conclude the motion to dismiss was sufficient to preserve the legal issue for appeal.

{¶31} Further, because the issue was preserved, the judgment denying the dismissal was appealed, *and* the issue of the application of the economic-loss rule is a question of law, we additionally conclude, even assuming appellants failed to raise the issue anew at the points identified by TRAX, the matter was not waived.

{¶32} "The economic-loss rule generally prevents recovery in tort of damages for purely economic loss." *Corporex Dev. & Const. Mgmt Inc. v. Shook, Inv.,* 106 Ohio St.3d

13

412, 2005-Ohio-5409, ¶6. "'[T]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.'" *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 45 (1989), quoting *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.*, 345 N.W.2d 124, 126 (Iowa 1984). This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that "parties to a commercial transaction should remain free to govern their own affairs." *Chemtrol, supra*, at 42; *see, also*, *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.*, 54 Ohio St.3d 1, 7 (1990), quoting *Sensenbrenner v. Rust, Orling & Neale Architects, Inc.*, 236 Va. 419, 425 (1988). "'Tort law is not designed * * * to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.'" *Floor Craft, supra*, at 3, quoting *Sensenbrenner, supra*.

{¶33} In effect, the economic-loss rule separates contract and tort claims by preventing a plaintiff from bringing a tort claim when the matter is properly resolved in contract. *See Corporex, supra*, at ¶6. The crucial difference between the law of tort and contracts is the source of the duty imposed. Contractual duties emanate from bargained-for agreements between specific parties who allocate risks and benefits. *See Floor Craft, supra*, at 7. Alternatively, tort duties arise from public policy considerations. That is, "[t]ort law offers redress for losses suffered by reason of a breach of some duty imposed

14

by law to protect the broad interests of social policy."   *Morgan v. Mikhail*, 10th Dist. Franklin Nos. 08AP-87 and 08AP-88, 2008-Ohio-4598, ¶62, citing *Floor Craft, supra.*  Put simply, the law of tort protects people and property from injury, while the law of contract protects parties' bargained-for expectations. *Morgan, supra*.

{¶34} If a plaintiff suffers only economic losses, a court must consequently determine *the source* of the duty that forms the basis of the action. *See Corporex, supra*, at ¶10.  A plaintiff may pursue such a tort claim if it is "based exclusively upon [a] discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity." *Corporex*, supra at ¶9.   Consequently, the economic-loss rule would not bar a plaintiff from bringing a tort where the tort duty is independent of the contract.  The issue, therefore, is whether, irrespective of the substantive evidence presented at trial, appellants had a duty *not* to defraud TRAX which was independent of the contract giving rise to TRAX's involvement in the Project.  We hold such a duty exists.[3]

{¶35}  The societal interest in protecting people from fraud is fundamental and reflected by the civil and criminal liability imposed for such acts or omissions. *Hanamura-Valashinas v. Transitions by Firenza, LLC*, 11th Dist. Lake No. 2019-L-089, 2020-Ohio-4888, ¶37. No societal interest is served by promoting either the concealment of material facts with the intent to mislead or the affirmative flow of information not genuinely believed by its source to be true.  Hence, we hold public policy is best served by acknowledging an independent duty not to commit fraud and leaving open the potential of an intentional

---

3.  It is important to note that the seminal economic loss rule cases cited by appellants concern negligence claims, not intentional torts, such as fraud.  *See Corporex, supra*; *Floor Craft, supra*; *Chemtrol Adhesives, Inc., supra.* In this respect, those cases are factually different than this matter, which alleged an intentional tort – a matter outside the economic loss rule to the extent it is premised upon a duty independent of the contract at issue.

Case Nos. 2020-L-113, 2020-L-127, 2021-L-008

tort suit to loom over a party considering actual fraud. This conclusion is consistent with other cases with similar fact patterns. *See Eysoldt v. ProScan Imaging,* 194 Ohio App.3d 630, 2011-Ohio-2359, ¶21 (1st Dist.) ("the economic-loss doctrine does not apply to intentional torts."); *Hanamura-Valashinas*, *supra* (wherein this court concluded the falsification of billing statements violated a duty independent of the construction agreement and so provided grounds for a claim of fraud not barred by the economic-loss rule); *see also Windsor Med. Ctr., Inc. v. Time Warner Cable, Inc.*, 5th Dist. Stark No. 2020CA00085, 2021-Ohio-158, ¶27 (fraud claims are "exempt" from the economic-loss doctrine). We therefore conclude the trial court did not err, as a matter of law, in denying the pretrial motion to dismiss; the motion for directed verdict; and its motion for judgment notwithstanding the judgment as the economic loss rule did not bar TRAX's fraud claim.

{¶36} With the foregoing in mind, appellants suggest the fraud claim was improperly premised upon the breach of ethical obligations, which, in their view, cannot serve as the basis for imposing an actionable duty of care under the law. Regardless of the accuracy of this legal premise, any alleged breach of ethical standards (which were addressed at length during Mr. Esser's and Mr. Lewis' cross-examination) was not the basis of the intentional tort. Rather, as discussed above, the obligation not to commit fraud, which the jury determined appellants violated, was the independent source out of which liability was premised.

{¶37} We recognize that TRAX went to great lengths to illustrate how the OHM defendants' acts or omissions violated professional duties; still, this testimony was elicited prior to the trial court's granting appellants' motion for directed verdict on TRAX's negligence claim. In other words, the testimony may have been initially offered to help

16

establish the OHM defendants were negligent in their management of the Project. Because, however, that claim was subsequently dismissed, it was no longer material to that theory. Still, the testimony was probative to the extent it served to establish that the OHM defendants were not operating above professional reproach throughout their administration of the Project. In this respect, the fraud claim was not premised upon an ethical duty of disclosure, but evidence of the alleged breach of that duty (or other professional obligations) provides evidence of potential fraud. Because the basis of liability was the breach of the independent duty not to commit fraud, not the breach of professional ethical duties, appellants' suggestion is without merit.

{¶38} Finally, appellants further argue that if this court determines the economic-loss rule does not bar TRAX's fraud claims, the professional-design community will suffer the peril of significantly increased business-related costs and be exposed to heightened litigation risks which, in many cases, could be frivolous. The specter of the slippery slope does not dissuade this court's position. Fraud is an intentional tort which requires heightened pleading requirements and, as with any intentional tort, proof. Furthermore, a plaintiff can bring a fraud claim without subverting contract law because the viability of such a claim depends only upon a defendant's conduct, not the type of damage or the existence of an underlying contract. In this respect, professional designers need only meet the standard of care they owe all clients and adhere to the general duty not to defraud in order to avoid exposure to liability. In short, the best way to minimize the costs and burdens identified by appellants is to require the party with the best access to information to disclose the information. An otherwise innocent, nonbreaching party

17

should not bear the burden of trying to police potentially deceitful conduct that society, as a whole, detests.

{¶39} Appellants' first assignment of error lacks merit.

{¶40} For their second assignment of error, appellants allege:

{¶41} "The trial court committed reversible error by denying the motion for directed verdict (TTr pp 648-649) and the motion for JNOV (10/21/20 journal entry) with respect to plaintiff TRAX's fraud claims because TRAX failed to present competent and credible evidence on every essential element."

{¶42} Initially, when the court denies a motion for a directed verdict at the close of a plaintiff's case-in-chief, the disappointed party must renew the motion at the close of all the evidence in order to preserve it for appeal. *See Chem. Bank of New York v. Neman*, 52 Ohio St.3d 204, 207 (1990) (finding that a plaintiff "waived any claim of error in the denial of the directed verdict by failing to renew his motion at the close of all evidence"). At the close of evidence, the OHM defendants moved for a directed verdict only on the Village's claims against them. They did not renew their motion against TRAX and, in this respect, the arguments, as they relate to the trial court's initial denial of the motion for directed verdict are forfeited. Nevertheless, because the arguments asserted in the motion for judgment notwithstanding the verdict challenge the same points, namely, TRAX's proof, we shall address them accordingly.

{¶43} The elements of a claim of fraudulent concealment requires sufficient, credible evidence of the following elements:

{¶44} "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge

18

of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." (citation omitted). *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶47.

{¶45} Appellants first contend there was no fiduciary relationship between the OHM defendants and TRAX. At most, they concede an arm's-length business relationship existed between the parties; this, however, does not rise to a fiduciary relationship. While appellants are correct that the parties' business relationship was not a special relationship rising to a fiduciary association, this does not undermine TRAX's proof on the first element of fraud.

{¶46} Generally, in business transactions, each party is presumed to have the opportunity to ascertain relevant facts, and therefore, neither party has an obligation to disclose material information to the other. *Blon v. Bank One,* 35 Ohio St.3d 98, 101 (1988). A duty to disclose arises in business dealings, however, when the parties are in a fiduciary relationship, both parties to the transaction understand that a special trust or confidence has been reposed, or *full disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts. Id.*; *see, also, Word of God Church v. Stanley,* 2d Dist. Montgomery No. 07-CV-4467, 2011-Ohio-2073, ¶26-27; *Gator Dev. Corp. v. VHH, Ltd.,* 1st Dist. Hamilton No. C-080193, 2009-Ohio-1802, ¶28; *Levy v. Seiber*, 12th Dist. Butler Nos. CA2015-02-019, CA2015-02-021, and CA2015-02-030, 2016-Ohio-68, ¶31. For instance, a party must speak upon failing "'to exercise reasonable care to disclose a material fact which may justifiably induce

19

another party to act or refrain from acting, and the nondisclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.'" *State v. Warner,* 55 Ohio St.3d 31, 54, (1990), quoting *Miles v. McSwegin*, 58 Ohio St.2d 97, 100 (1979)

{¶47} Furthermore, we recognize that "the mere failure to disclose a fact is not equivalent to concealment, which implies a purpose or design." *Jenkins v. Clark*, 7 Ohio App.3d 93, 101 (2d Dist.1982). "Silence[, however,] will constitute a misrepresentation * * * if the circumstances are such that the law recognizes a duty to speak." *Schulman v. Wolske & Blue Co., L.P.A.,* 125 Ohio App.3d 365, 372 (10th Dist.1990); *see also Miles, supra,* at 99 (an action for fraud may be based upon "the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak.") Put differently, "within the context of the law of fraud, where there is a duty to disclose, silence alone may constitute concealment." *PYA/Monarch, Inc. v.* Horner, 72 Ohio App.3d 791, 793 (3d Dist.1991). Under the circumstances, the jury could conclude that full disclosure was necessary to dispel misleading or false impressions created by partial revelation of facts on OHM's behalf such that a duty to disclose was created. *See Stanley, supra.*

{¶48} At trial, although Mr. Hines testified he never assured Mr. Valletto the change orders, which occurred as a result of design problems, would be paid, Mr. Valletto testified to the contrary. Mayor Alonso testified that if OHM approved payments, the Village would pay. As of November 28, 2017, almost a month after the originally scheduled completion date, Mr. Valletto stated TRAX had not received any payment. And, on December 12, 2017, TRAX again inquired into the processing of payment applications; Mr. Hines responded that OHM would only discuss extensions of the

20

completion date and nothing else. Mr. Valletto stated that had he known TRAX would not be paid (or, by circumstantial implication, payment would be such a strenuous process), it would have stopped work instead of incurring greater expense.

{¶49} Mr. Esser recognized that, acting as the Project's manager, OHM owed TRAX various duties: "integrity, honor, and the dignity of the engineering profession"; the obligation to issue truthful statements; and to deal fairly and honestly and to keep TRAX fully informed regarding the Project. Moreover, TRAX continued to work in reliance on Mr. Hines' assurances of payment. It regularly communicated its concern with the lack of transparency regarding payment and/or the payment application process. If there were issues internal to OHM's ability to approve the applications, it was obligated to notify TRAX or, at least, respond to TRAX's repeated inquiries regarding payment as well as the Project's overall status.

{¶50} Also, an email, sent by Mr. Hines (or some agent of OHM) to the transitioning project manager in December 2017, stated that the former must speak to the latter "verbally" to discuss the Project. This suggests that OHM desired to avoid a "paper trail" regarding the Project's progress and ultimate completion – matters to which TRAX never had access (despite numerous inquiries directed at both OHM and the Village) and never would have access due to its eventual termination for convenience in favor of a third-party contractor, Trimor. Trimor is a company owned by a friend and former business associate of Mr. Esser.

{¶51} The evidence was sufficient to establish that OHM did not fully and accurately disclose the inner-workings of the change order/payment application process, yet full disclosure would have dispelled any misleading impressions on behalf of TRAX.

21

Case Nos. 2020-L-113, 2020-L-127, 2021-L-008

There was also sufficient evidence that TRAX could have been terminated for convenience much earlier, saving it significant time and resources; instead, due to OHM's failure to disclose material points regarding the Project's direction and progress as well as TRAX's reliance on Mr. Hines' representations vis-à-vis payment, it remained on site, expecting to complete the work at OHM's direction. TRAX presented adequate, credible evidence to establish OHM misrepresented or concealed facts, material to the Project and its work, that were made either falsely or with reckless disregard to the truth or falsity and the reasonable inferences that could be drawn from the misrepresentation(s) or concealment(s).

{¶52} Next, appellants contend TRAX failed to establish direct evidence of fraudulent intent.

{¶53} Initially, TRAX was not required to provide direct evidence of intent to defraud. Courts have noted that establishing fraudulent intent by direct evidence is difficult; as a result, circumstantial evidence may be used to establish intent to defraud. *Doyle v. Fairfield Mach. Co.*, 120 Ohio App.3d 192, 208 (11th Dist.1997); *Davis v. Sun Refining & Mktg. Co.*, 109 Ohio App.3d 42, 56 (2d Dist.1996).

{¶54} With this in mind, TRAX presented evidence that it sent numerous written communications to OHM and the Village; neither OHM nor the Village directly or materially responded to TRAX's concerns regarding payment applications, processing of change orders, deadline extensions, or the status of the Project. Although OHM offered testimony that on-site, verbal conversations occurred regularly, the substance of these conversations is relatively unknown. Furthermore, the letters routinely sought meetings with OHM and the Village – only two progress meetings, however, occurred throughout

22

TRAX's time on the Project. Moreover, Mr. Esser testified he was OHM's designated contractual contact with TRAX as well as the Project Manager; he additionally testified he did not agree with TRAX's representations (in its letters) regarding its concerns that there were significant design errors in OHM's plans. Still, he did not contact any TRAX representative to discuss the matter.

{¶55} Additionally, TRAX contacted OHM (including Mr. Esser) and stated it was concerned with expenses relating to unforeseen delays on the Project and costs associated with its idle equipment. And, although Mr. Esser stated he was unsure why TRAX could not continue with "other work" during the idle time, he agreed that TRAX was entitled to notice that either OHM or the Village did not believe it was entitled to compensation for the idle time. No such communication occurred.

{¶56} Further, eventually, in late December, TRAX notified OHM and the Village it considered itself on "indefinite standby" by being forced to finance costs of extra work due to delays and other interferences; notwithstanding these remarkable concerns, TRAX received no response. From these points, the jury could infer appellants intended to keep information regarding the Project from TRAX and keep it on the Project as long as it could without processing its paperwork or financing the additional work or idle time. This is a particularly strong inference given that OHM admittedly disagreed with some of TRAX's concerns, but did not reach out, let alone meet with its representatives despite multiple requests.

{¶57} Moreover, during his deposition, Mr. Esser stated he had information on his company lap-top and he would provide the same to TRAX. This information, whatever it was, was never produced and was ostensibly lost. Even though the content of the

23

information was unknown, TRAX and Mr. Esser were aware of its existence, TRAX was told Mr. Esser would produce it, and it was never produced and potentially lost. The jury could draw the circumstantial inference that, in light of these and other points, the information was intentionally lost.

{¶58} Additionally, a December 17, 2017 email sent by Mr. Hines to Mr. Tucker, after Mr. Tucker was installed as Project Manager, stated the former wished to speak with the latter regarding the Project. It also stated, however, that communication should be verbal rather than written. The jury could infer that this email was an effort to avoid the creation of a paper trail regarding OHM's strategy regarding further administration of the Project. Mr. Hines denied writing the email, but OHM ultimately admitted the message came from OHM's server. In light of OHM's reluctance to respond to TRAX's numerous letters regarding change orders, payment, delay, and concerns on idle equipment and time, this email could be reasonably viewed to show an intent to deceive or conceal material information from TRAX regarding its status on the Project.

{¶59} Regarding TRAX's justifiable reliance, Mr. Esser, Mr. Lewis, and Mr. Hines agreed that TRAX was entitled to rely upon OHM's designs and representations as well as its professional duty to be honest and respond appropriately to TRAX's written concerns. And Mr. Valletto testified Mr. Hines stated TRAX had the right to rely upon payment in relation to payment applications and change orders. Although Mr. Hines disputed he made any such assurance, the jury was entitled to weigh the testimony and elected to believe TRAX's evidence. There was thus sufficient, credible evidence on the element of reasonable and justifiable reliance.

24

{¶60} Finally, appellants claim TRAX failed to establish damages proximately resulting from the foregoing elements. Appellants essentially claim TRAX only established "contract damages," not "fraud damages." We find this distinction of little import.

{¶61} Initially, TRAX, via its Exhibit 33, provided the following evidence of damages:

{¶62} Outstanding Line Items and Pay: $65,459.47; Request Discrepancies Retainage Owed: $82,852.25; Change Order Amounts Owed: $308,021.27; Claims Submitted Including Home Office, Stand-By: $590,218.85; Estimated Interest Owed: $15,000.00. These damages totaled $1,061,551.84.

{¶63} This court has held that even if a plaintiff seeks damages against one party for a breach of contract, that plaintiff may still recover against another party in tort, even if the damages overlap. *Kent State Univ. v. Bradley Univ.*, 11th Dist. Portage No. 2017-P-0056, 2019-Ohio-2088, ¶78. Specifically, this court, adopting the reasoning of the First and Twelfth Appellate Districts, observed """the mere existence of a plaintiff's inchoate cause of action against one party for breach of contract does not foreclose an action in tort against another party for all damages suffered by reason of the latter's inducement of such a breach."" *Id.*, quoting *Ginn v. Stonecreek Dental Care*, 12th Dist. Fayette No. CA2016-10-014, 2017-Ohio-4370, ¶16, quoting *Davison Fuel & Dock Co. v. Pickands Mather & Co.*, 54 Ohio App.2d 177 (1st Dist.1977). Accordingly, even if the calculated damages were initially a function of a breach of contract, they were still recoverable in tort to the extent TRAX met its burden that they were also a proximate result of appellants' actions.

25

{¶64} Moreover, the trial court instructed the jury that: "There may be more than one proximate cause of the damages. The fact that some other cause combined with the acts or omissions of a defendant in producing damage does not relieve a defendant from liability so long as the plaintiff proves that the conduct of a defendant was a substantial factor in producing the harm." Appellants did not object to this instruction and, because it reasonably reflects the law set forth above, we hold TRAX established, by a preponderance of the evidence, that the damages were a proximate result of appellants' acts or omissions.

{¶65} Finally, and notwithstanding the foregoing points, appellants cite cases which suggest that fraud claims require definitive proof of damages separate from and in addition to economic damages attributable to a breach of contract. *See Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 150-153 (9th Dist.1996); *Strategy Group for Media, Inc. v. Lowden*, 5th Dist. Delaware No. 12 CAE 03 0016, 2013-Ohio-1330, ¶30-31; *Dayton Children's Hosp. v. Garrett Day, LLC.*, 2d Dist. Montgomery No. 28047, 2019-Ohio-4875, ¶106-107. The first two of these cases involve fraud and contract claims against same defendant; and in the third, although various defendants were named, the court indicated the plaintiffs were unable to establish an independent duty beyond the contract. These cases are therefore not analogous to the instant matter. Here, the overlap between TRAX's breach of contract claim against the Village and fraud damages sought against appellants relate to distinct actors and, therefore, the breach of contract claim does not bar the damages claimed resulting from appellants' alleged fraud.

{¶66} Appellants' second assignment of error is without merit.

{¶67} Appellants' third assignment of error provides:

26

{¶68} "The trial court clearly erred by denying a JNOV (10/21/20 Journal Entry) with respect to punitive damages and attorney fees awarded to TRAX because the awards were legally untenable and TRAX failed to satisfy the onerous burden of proof."

{¶69} When reviewing a ruling on a motion for judgment notwithstanding the verdict, we must construe the evidence most strongly in favor of the nonmoving party, and where there is substantial evidence to support that side of the case, upon which reasonable minds could reach different conclusions, the motion must be overruled. *Pelletier v. Rumpke Container Serv.*, 142 Ohio App.3d 54, 60 (1st Dist.2001). "Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either motion." *Id.*

{¶70} Punitive damages are designed to punish tortfeasors for losses caused by actual malice and to deter similar conduct in the future. *Whetsone v. Binner*, 146 Ohio St.3d 395, 2016-Ohio-1006, ¶15. Ohio law is well settled that punitive damages are available for personal injury or property loss caused by malice or ""intentional, reckless, wanton, willful and gross acts."" *Rubeck v. Huffman,* 54 Ohio St.2d 20, 23 (1978), quoting *Columbus Fin., Inc. v. Howard,* 42 Ohio St.2d 178, 184 (1975), quoting the appellants' brief. Further, "[a]ttorney fees are proper when the court has awarded punitive damages." *Boaeuf v. Memphis Station, L.L.C.*, 8th Dist. Cuyahoga No. 105799, 2018-Ohio-745, ¶15.

{¶71} The trial court charged the jury accordingly:

{¶72} "Punitive damages may be awarded against the defendants as a punishment to discourage others from committing similar wrongful acts. You are not required to award punitive damages to TRAX Construction Company, and you may not

27

do so unless you find that TRAX Construction Company has met its burden to prove by clear and convincing evidence that: (A) Defendants' actions demonstrated actual malice; or (B) Defendants' actions demonstrated aggravated or egregious fraud." The instruction defined actual malice (a state of mind characterized by hatred, ill will, or a conscious disregard for the rights and safety of others which creates the great possibility of substantial harm), aggravated fraud (where fraud is accompanied by malice or ill will or if it is particularly gross or malicious), and clear and convincing evidence (evidence producing in the minds of the jurors a firm belief or conviction about the facts to be proved).

{¶73} Appellants initially claim the punitive damages award fails because TRAX failed to establish the requisite proof of fraud. As we previously concluded TRAX met its burden on the predicate claim of fraud, appellants' argument in this respect fails.

{¶74} The evidence adduced at trial could allow the jury to find, by clear and convincing evidence, that appellants willfully, intentionally, or maliciously misrepresented or concealed material facts that proximately cause the damages sought. The jury could reasonably conclude that OHM kept TRAX on the Project, without transparently communicating with it and/or ignoring its entreaties to discuss payment, change orders, as well as the Project's general direction. Appellants draw our attention to allegedly misleading arguments made during closing that they claim improperly invited the jury to engage in conspiratorial, inferential leaps. As just noted, there was sufficient testimonial evidence to support TRAX's fraud claim and, from this evidence, the jury could have reasonably premised its determination that it was entitled to punitive damages, either through a finding of actual malice or aggravated fraud. As we may not consider the weight

28

of the evidence or witness credibility when reviewing the denial of a JNOV, we conclude TRAX advanced sufficient evidence to support the jury's award of punitive damages and the trial court's order of attorney fees.

{¶75} Appellants' third assignment of error lacks merit.

{¶76} Appellants' fourth assignment of error provides:

{¶77} "The trial court committed reversible error by denying a motion for directed verdict (TTr pp 785-786; 1/27/20 Judgment Entry) and a subsequent motion for JNOV (10/21/20 Journal Entry) on VOR's [The Village's] legally defective cross-claim for indemnification."

{¶78} Appellants assert the trial court erred in denying its motion for directed verdict and its motion for judgment notwithstanding the verdict on the Village's indemnity claim because the jury did not find it liable as a common tortfeasor and, even though it was found liable for breach of contract, the jury awarded zero damages. As a result, appellants assert their derivative claim for indemnification must fail as a matter of law.

{¶79} "Indemnity arises from contract, either express or implied, and it is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement." *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 240 (1987). Implied indemnification "'arises in favor of a person who without any fault on his part is exposed to liability and compelled to pay damages on account of the negligence or tortious act of another, the former having a right of action against the latter for indemnity, provided they are not joint tort-feasors * * *.'" *Maryland Cas. Co. v. Frederick Co.*, 142 Ohio St. 605, 607 (1944), quoting 31 Corpus Juris., 447, Sec. 47.

29

**{¶80}** First of all, the evidence demonstrated that although the Village and TRAX entered into the contract for TRAX to be the underground utility contractor on the Project, Mayor Alonso testified the OHM defendants oversaw the Project and dealt directly with TRAX. There was no dispute that Mr. Esser was the Project Manager up through December 2017 and Mr. Hines was the on-site contact between TRAX and OHM. Moreover, the Mayor indicated that all payments the Village owed TRAX were considered and approved by OHM prior to the Village releasing payment. Given the factual nature of the relationship the Village had with TRAX, the jury's determination that if the Village was found liable for damages relating to the contract, it should be entitled to indemnification from OHM is reasonable.

**{¶81}** In this matter, the Village is not a joint or common tortfeasor. And, while the Village was found liable for breach of contract, the jury concluded that, given the context of the case, TRAX suffered no damages that were the natural and probable result of the Village's breach. As such, the Village was responsible for *no* compensatory or punitive damages. Because the Village was deemed to owe TRAX nothing, TRAX cannot pursue the Village for damages and, as a result, the Village would never need to exercise its right to indemnification. The indemnification verdict, therefore, has no effect. This, however, does not imply the trial court erred in denying OHM's motion for JNOV on the indemnification verdict. Simply because the verdict has no practical effect does not mean the jury erred in rendering it; it simply means the issue of indemnification, in light of the zero damages award, is moot.

**{¶82}** As a general matter, courts will not resolve issues that are moot. *In re Brown,* 10th Dist. Franklin No. 03AP-1205, 2005-Ohio-2425, ¶15. Actions are moot "when

they are or have become fictitious, * * * hypothetical, academic or dead. The distinguishing characteristic of such issues is that they involve no actual genuine, live controversy, the decision of which can definitely affect existing legal relations. * * * 'A moot case is one which seeks to get a judgment on a pretended controversy, when in reality there is none, or a decision in advance about a right before it has been actually asserted and contested, or a judgment upon some matter which, when rendered, for any reason cannot have any practical legal effect upon a then-existing controversy.'" *Grove City v. Clark,* 10th Dist. Franklin No. 01AP-1369, 2002-Ohio-4549, ¶11, quoting *Culver v. Warren,* 84 Ohio App. 373, 393 (7th Dist.1948). The issue identified by OHM is merely academic and presents a point which we can offer no meaningful remedy. We therefore conclude the issue raised under this assignment of error is moot, and the trial court did not err in denying OHM's motion for JNOV on the Village's indemnification claim.

{¶83} Appellants' fourth assignment of error lacks merit.

{¶84} Appellants' final assignment of error provides:

{¶85} "The trial court committed reversible error by refusing to order a new trial (10/21/20 Journal Entry) on TRAX's fraud claims and VOR's [the Village's] indemnity cross-claim because the jury verdict was against the great weight of the evidence and was the product of instructional error and attorney misconduct."

{¶86} Appellants first argue the trial court improperly instructed the jury on TRAX's burden of proof; in their view, the proper standard for civil fraud is "clear and convincing evidence," not the lower, general civil proof of a "preponderance of the evidence." We do not agree.

31

{¶87} "A party seeking an equitable remedy, such as declaratory judgment, reformation or rescission of a contract, must prove a fraud claim with clear and convincing evidence, while a party seeking a monetary remedy must prove fraud by the preponderance of the evidence." *Andrew v. Power Marketing Direct, Inc.*, 10th Dist. Franklin No. 11AP-603, 2012-Ohio-4371, ¶47, citing *Household Finance Corp. v. Altenberg,* 5 Ohio St.2d 190 (1966), syllabus; *see, also*, *Rider v. Rider*, 11th Dist. Trumbull No. 98-T-0202, 2000 WL 522349, *2 (Mar. 31, 2000) ("Since the present case does not involve equitable relief but, instead, is an ordinary action at law for money damages based upon fraud, the proper standard of proof is 'preponderance of the evidence.'"). In this case, because TRAX sought monetary damages, i.e., a legal remedy, the trial court correctly instructed the jury the standard of proof is a "preponderance of the evidence."

{¶88} Next, appellants assert the jury's verdict on TRAX's fraud claim is against the manifest weight of the evidence.

{¶89} "[A]n appellate court will not reverse a judgment as being contrary to the weight of the evidence as long as there is some competent, credible evidence supporting the judgment." *In re Kangas*, 11th Dist. Ashtabula No. 2006-A-0084, 2007-Ohio-1921, ¶81. The manifest-weight standard of review is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶17.

{¶90} When applying the manifest-weight standard of review, the reviewing court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Id.* at ¶20,

32

quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, (9th Dist.2001). "The finder of fact is entitled to believe all, part, or none of the testimony of any witness." *River Oaks Homes, Inc. v. Twin Vinyl, Inc.*, 11th Dist. Lake No. 2007-L-117, 2008-Ohio-4301, ¶27.

{¶91} "Under the manifest weight standard of review, we are 'guided by a presumption' that the fact-finder's findings are correct." *Terry v. Kellstone, Inc.*, 6th Dist. Erie No. E-12-061, 2013-Ohio-4419, ¶13, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 79-80 (1984). *See also Eastley, supra,* at ¶21. We must make "'every reasonable presumption * * * in favor of the judgment and the finding of facts.'" *Id.*, quoting *Seasons Coal Co.* at 80, fn. 3. "'If the evidence is susceptible of more than one construction,'" we are "'bound to give it that interpretation which is consistent with the * * * judgment [and] most favorable to sustaining the * * * judgment.'" *Eastley, supra,* quoting *Seasons Coal Co., supra*.

{¶92} As discussed under appellants' second and fourth assignments of error, the jury's verdicts on TRAX's fraud count and the Village's indemnification count are supported by sufficient, credible evidence. OHM, via its representatives, presented competing testimony and attempted to explain the reasons why the Project went in a direction which led to the underlying suit. The jury was able to evaluate OHM's, Mr. Esser's, the Village's and TRAX's acts and omissions. In doing so, if found OHM and Mr. Esser liable for fraud and determined that the Village was entitled to indemnification, to the extent such was required. We cannot conclude the jury lost its way or the result of the trial resulted in a manifest miscarriage of justice.

{¶93} Finally, appellants claim TRAX's counsel and the Village's counsel embraced a "scorched earth" strategy during closing by launching personal attacks on

33

witnesses, creating false flags, asserting baseless conspiracy theories, and requesting the jury to draw negative inferences against them. Appellants assert this strategy was designed to mislead, influence, and inflame the jury in way that would compel a verdict against them. In this respect, appellants contend the jury did not render a verdict based upon the evidence, but accepted counsels' invitation to make its decision on passion and bias. We do not agree.

{¶94} Appellants point to various phrases used by TRAX's counsel they deem troublesome, e.g., "cone of silence," "missing" flash drive, "snowed fraud in the courtroom," "liar," and "took advantage of the small guy." Although counsel may not comment on his or her personal belief regarding the evidence, these comments, when viewed in relationship to the closing as a whole, do not rise to the level of misconduct. Indeed, a review of counsels' respective closings reveal little in the way of any grandstanding or commentary that might be considered unfair or prejudicial. In effect, appellants overstate the purported problematic content counsels' rhetoric and argument in closing.

{¶95} Moreover, appellants assert that TRAX's counsel improperly asserted Mr. Esser engaged in the spoliation of evidence, in violation of a pre-trial motion in limine. In closing, counsel does mention that Mr. Esser failed to provide certain evidence that was previously on an OHM thumb drive and connects this point to other evidence which supported TRAX's theory that the OHM defendants were fraudulently concealing material information from it. Still, no objection was leveled at this line of argument and appellants did not renew their motion in limine at trial. It is axiomatic in Ohio that "[a] motion in limine is tentative and precautionary in nature, reflecting the court's anticipatory treatment of an

34

evidentiary issue at trial. * * * Finality does not attach when the motion is granted. * * * (Citations omitted.)" *Defiance v. Kretz*, 60 Ohio St.3d 1, 4 (1991). Thus, "a motion in limine is a prospective order and makes no determination as to the ultimate admissibility of the evidence." *Krosky v. Ohio Edison Co.*, 20 Ohio App.3d 10 (9th Dist.1984), paragraph five of the syllabus. As there was no renewed objection, we decline to find error in counsels' angle of argumentation.

{¶96} ""A [party] may freely comment in closing argument on what the evidence has shown and what reasonable inferences the [party] believes may be drawn therefrom."" *Torres v. Concrete Designs*, 8th Dist. Cuyahoga Nos. 105833 and 106493 2019-Ohio-1342, ¶19, quoting *Peffer v. Cleveland Clinic Found.,* 8th Dist. Cuyahoga No. 94356, 2011-Ohio-450, ¶27, quoting *State v. Clay,* 181 Ohio App.3d 563, 2009-Ohio-1235, ¶47 (8th Dist.). In our view, counsels' comments during closing were not so suspect or inflammatory to justify a finding of misconduct. We therefore conclude that the verdict, which was explained via post-trial jury interrogatories, was based not upon counsels' closing, but upon the evidence submitted during the trial.

{¶97} Appellants' fifth assignment of error lacks merit.

{¶98} For the reasons discussed in this opinion, the judgment of the Lake County Court of Common Pleas is affirmed**.**


MARY JANE TRAPP, P.J.,

MATT LYNCH, J.,

concur.


35

Case Nos. 2020-L-113, 2020-L-127, 2021-L-008